PEOPLE v GILLMAN

1. WITNESSES—CRIMINAL LAW—ALIBI—REBUTTAL—MATERIALITY OF
   TESTIMONY.

   Alibi testimony is testimony which is offered to prove that a
   defendant was somewhere other than at the scene of a crime
   when the crime occurred; therefore, a witness who does not
   give any testimony as to a defendant's whereabouts at any time
   material to the theories of proof in a case is not an alibi
   witness.

2. WITNESSES—CRIMINAL LAW—ALIBI—IMPEACHMENT—CONTRADIC-
   TORY TESTIMONY—REBUTTAL.

   A witness who is called solely to impeach the testimony of an
   alibi witness and who does not offer testimony contradicting
   the actual alibi testimony given is not a rebuttal witness to the
   alibi and, therefore, is not subject to the four-day notice to
   opposing counsel provision for alibi rebuttal witnesses.

3. LARCENY—BREAKING AND ENTERING—ELEMENTS—ENTRY—PART OF
   BODY.

   It is sufficient if any part of a defendant's body is introduced
   within the premises where an entering is a necessary element
   of a criminal offense.

4. LARCENY—BREAKING AND ENTERING—ABSOLUTE BARRIERS—
   WOODEN BARS—NEGATING ELEMENTS.

   Wooden bars which were spaced far enough apart to allow a
   defendant to stick his arm through the window they covered
   and which were purposely designed so that they could be easily
   removed did not constitute an absolute barrier to entry which
   would negate the element of entry in a charge of breaking and
   entering.

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 21 Am Jur 2d, Criminal Law §§ 136, 137.
   81 Am Jur 2d, Witnesses § 4.
   Constitutionality, construction, and effect of statutes requiring no-
     tice of prosecution of accused's intention to rely upon alibi as
     defense. 30 ALR2d 480.
[3, 4] 13 Am Jur 2d, Burglary § 8.

Appeal from Lenawee, Rex B. Martin, J. Submitted December 2, 1975, at Lansing. (Docket No. 21437.) Decided January 6, 1976.

Archie Gillman was convicted of breaking and entering. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Harvey A. Koselka,* Prosecuting Attorney (Prosecuting Attorneys Appellate Service, *Edward R. Wilson,* Director, by *Lee W. Atkinson,* Assistant Attorney General), for the people.

*F. Michael Schuck, III,* Assistant State Appellate Defender, for defendant.

Before: R. B. Burns, P. J., and D. E. Holbrook and D. F. Walsh, JJ.

D. E. Holbrook, J. Defendant was convicted by a jury of breaking and entering, contrary to MCLA 750.110; MSA 28.305. He was sentenced to 3-1/2 to 10 years in prison and appeals as of right.

At trial, the break-in was alleged to have occurred at a certain sporting goods store in Adrian Township, Lenawee County. The first witness called by the prosecution was the manager of the store, Mr. Johnson. He testified that he lived next to the store. He further testified that on April 1, 1974, he was awakened at "right around" 4:15 a.m. by the burglar alarm at the store. Mr. Johnson rushed to investigate. At the store, he noticed that a plastic covering which had been over one of the windows had been torn off. He saw that the window had been shattered, and that some bottles and a can of wood stain, which had been inside the window, were now laying on the ground outside of

the building. Mr. Johnson was asked how the
burglar alarm device worked. He explained that
wooden bars covered the window openings, and
that there were wires attached to the bars. When
one of the bars was moved, a circuit was broken
and the alarm was set off. These bars were located
approximately three inches inside the window,
four bars to a window. Mr. Johnson testified that
the bars could be broken very easily, thus setting
off the alarm. When Mr. Johnson arrived at the
store to investigate the cause of the alarm, he also
noticed that one of the bars covering the window
had been broken away. He testified that he imme-
diately called the police.

The next prosecution witness, Deputy Waycaster
of the Lenawee County Sheriff's Department, testi-
fied that he received the call from Mr. Johnson at
approximately 4:15 or 4:20 in the morning of April
1, 1974. He testified that he and another deputy
went immediately to the sporting goods store
where Mr. Johnson showed them the back window
that had been broken. He testified that he ob-
served three bottles and a can laying on the
ground outside of the window. He also saw some
broken glass. He observed some footprints leading
from the window to a fence, and followed them to
a point about 25 yards on the other side of the
fence. He and his partner radioed for a backup
unit, and about that time they received a report of
a suspicious person at an address which was only a
few hundred yards from the sporting goods store.
They proceeded to that address and found the
defendant working under the hood of his car
which was parked in the driveway. When the
deputies asked the defendant what he was doing,
he replied that he was having car trouble and he
was attempting to "hot-wire" his car. When they

asked what kind of car trouble he was having, defendant testified that he had lost his keys when he had gone up to the residence at that address in order to seek help. The deputies searched the driveway and the yard for defendant's keys but could not find them. Defendant has told the deputies that he had gone up to the residence, but that no one had answered the door. The deputy approached the residence, and the occupant, who had called in the suspicious person report, answered the door and told the deputy that no one had been to the door. The deputy noticed that defendant's boots were covered with the same type of reddish brown sand that had surrounded the sporting goods store. He also noted that there was no sand in either the driveway or the yard at the address where defendant's car was parked. The deputy asked defendant where he was going, and defendant answered that he was going to "the Sloan residence". The deputy knew of a Sloan residence in the area, but it was not on that road. The deputy testified that he knew defendant to have a prior record for breaking and entering. He placed defendant under arrest and the deputies returned to the sporting goods store with defendant in the back seat of the patrol car.

Deputy Waycaster then went on to testify that upon arriving back at the store, he had occasion to further observe the glass that was on the ground. He testified that it was covered with masking tape. He also found a can of beer which was three-quarters full sitting alongside the fence at the sporting goods store. It was the same brand as an empty can which was found in defendant's front seat. The deputy testified that he also found a screwdriver just northwest of the fence and alongside the tracks that he had followed. He testified

that it was similar to the screwdriver which the defendant had been using when working on his car. The screwdrivers, beer can, and glass with masking tape on it were all introduced into evidence.

Another sheriff's deputy testified that he had transported defendant to jail and that, while defendant was being booked, he noticed defendant remove a piece of tape from his chest and throw it into the waste basket at the sheriff's office. Defendant had apparently been using the tape as a bandage. The tape was offered into evidence as matching the masking tape used on the broken window. A roll with a little bit of masking tape left on it had also been found outside the broken window. There was testimony that it was fairly common in breaking and entering cases in the area to cover a window with masking tape before shattering it.

Finally, the prosecution called Detective Snyder who testified that later on the morning of April 1, he had made a search of the area. He testified as to finding some gloves which were introduced into evidence and also testified that he had followed intermittent tracks from the area of the sporting goods store to within a few feet of the residence at the address where defendant was apprehended.

Defendant called only two witnesses by which he attempted to establish an alibi. Defendant did not testify in his own behalf. After the testimony by the defense witnesses, the prosecution recalled Detective Snyder to the stand in an effort to impeach their credibility.

Further facts will be related as deemed necessary.

Defendant first claims that it was error for the trial court to allow Detective Snyder to be recalled

to the stand. He claims that Detective Snyder was a rebuttal witness as regards defendant's alibi defense. He says that since he received no notice from the prosecution that Detective Snyder would be called, the detective should not have been allowed to testify.

We should first note that the mere fact that a defendant labels a witness as an alibi witness does not make it so. In this case, one of defendant's witnesses was a former girl friend. She testified that she had been in defendant's company until 2:30 a.m. on the date in question. She only lived a short distance from the scene of the crime. Alibi testimony is testimony which is offered in order to prove that the defendant was somewhere else than at the scene of the crime when the crime occurred. *People v Watkins,* 54 Mich App 576, 580; 221 NW2d 437, 440 (1974). This witness did not give any testimony as to defendant's whereabouts at any time material to the theories of proof in this case. Therefore, she was not an alibi witness and we need not consider defendant's arguments in relation to her testimony or the possible rebuttal thereof.

Defendant's witness, Johnny Fisher, after testifying that he had in the past been convicted of breaking and entering and that he was a friend of defendant, testified that he picked defendant up on the road somewhere around 3 a.m. on the morning of April 1. He said he had to estimate the time because he himself did not wear a watch. He testified that he drove defendant over to Tecumseh. Defendant wanted to go there to spend the night with his parents, but upon arriving found that his parents were not at home. Mr. Fisher testified that he and defendant sat in the car for awhile in Tecumseh, and then returned to where

defendant's car was parked at the residence near the sporting goods store. Under cross-examination by the prosecutor, Mr. Fisher testified as follows:

"*Q.* So you turned onto Moore Road and dropped him off?
"*A.* Yes.
"*Q.* Walk over to his car with him?
"*A.* No.
"*Q.* Look at his car at all?
"*A.* I seen it.
"*Q.* You just dropped him off·on the street?
"*A.* Yeah.
"*Q.* What time was this? ·
"*A. Well, he looked at his watch and said it was twenty after four then.*" (Emphasis added.)

Since the evidence tended to show that the burglar alarm was activated at 4:15 a.m., and since the witness testified that he was with defendant until 4:20 a.m., he was an alibi witness. It is true that the witness's estimation of the time was based on a self-serving hearsay statement of the defendant, but this was not objected to at trial. If believed by the jury, the witness's testimony would have placed defendant somewhere other than the scene of the crime during at least part of the time in question. The defendant had notified the prosecution of his intention of claiming an alibi, and had named two witnesses to be called in support of his alibi defense. The court had directed the prosecution to notify defendant concerning the identity of any witnesses it intended to call to rebut the alibi defense. The prosecution never notified the defendant concerning any such witnesses. At trial, at the conclusion of Mr. Fisher's alibi testimony, the prosecution recalled to the stand Detective Snyder. Defense counsel objected to· Detective Snyder's

testimony on the ground that Snyder was an alibi rebuttal witness and, since the defense had not been notified that he was to be called in rebuttal of the alibi, he should not now be allowed to testify. The court stated:

"Now, if the people had somebody who was going to testify that they saw the defendant at a different place or at the scene of the crime, then I think they have a duty to notify the defendant of that after an alibi is placed on the record. * * * Now, the question here is whether or not somebody can testify to rebut the witnesses' story to show that perhaps they aren't credible rather than place the defendant at the scene at the time. I think Mr. Snyder had a right to testify as he did."

In essence, what the trial court was ruling was that Snyder was a witness called solely to impeach the alibi witness, and not to offer testimony contradicting the actual alibi testimony given. For several reasons, we believe that the trial judge ruled correctly.

First, Detective Snyder did not give any testimony which tended to contradict the testimony given by the alibi witness. He did not, for instance, state that he had knowledge of defendant's whereabouts during the time in question which differed from the testimony given by Mr. Fisher. He did testify that he had talked to Mr. Fisher that very morning and that Mr. Fisher had told him certain things which were at variance with the testimony that Mr. Fisher gave later that day. He claimed Mr. Fisher had told him that morning that he had dropped the defendant off at "4:20 or 4:30". This was at variance with the testimony given by the witness which was to the effect that he had dropped Mr. Gillman off at 4:20 a.m. on

April 1. Since it was indicated by the evidence that the crime occurred at 4:15, this variance in the testimony, if offered as substantive evidence, would have been in favor of the defendant rather than against him. It would have tended to prove his whereabouts for a larger portion of the relevant period of time. Certainly, this was not the prosecution's intent. They were merely trying to point out a prior inconsistent statement made by the alibi witness. We do not believe this type of testimony to truly be encompassed by the term "rebuttal to the alibi".

Further, it appears from the record that the prosecution was unable to locate Mr. Fisher until the morning of trial. At that time, Detective Snyder interviewed him. Because of this fact, it would have been absurd to require the prosecution to give four days notice that Detective Snyder was going to testify. It was not until the day of trial that the prosecution knew that Detective Snyder was even going to have an opportunity to interview the alibi witness. It was not until the alibi witness had testified that the prosecution was able to determine that there were inconsistencies between his testimony and the version of the facts he had given the detective earlier in the day. It was only at this point that the prosecution could know that it was going to call Detective Snyder in response to defendant's witness. Of course, if Detective Snyder had possessed personal knowledge of defendant's whereabouts at the time in question, and was prepared to give testimony which contradicted that given by the alibi witness, he would have been a true "rebuttal witness". But in that event, the prosecution would certainly have been aware of his knowledge well in advance of the trial. In such a case they would have been

required to give notice to the defendant of their intention to call him as a rebuttal witness.

Defendant cites *Wardius v Oregon,* 412 US 470; 93 S Ct 2208; 37 L Ed 2d 82 (1973), in support of his argument that Detective Snyder should not have been allowed to testify. We do not believe that *Wardius* is applicable here for three reasons. First, in *Wardius,* the lower court had disallowed the testimony of defendant's alibi witness because of failure to give notice as required by an Oregon statute. The Supreme Court held that this was error since the Oregon statute was unconstitutional. In the case before us, the defendant did give his alibi testimony.

Second, we do not believe that the *Wardius* case was intended to apply to prosecution witnesses called only for the purpose of impeaching an alibi witness's credibility. As we have already indicated, we do not believe that Detective Snyder was a "rebuttal" witness as contemplated by the Court in *Wardius.*

Third, in speaking of the necessity for a statutory provision requiring notice by the prosecution of the identity of its intended rebuttal witnesses, the Supreme Court in *Wardius* said at 412 US 475; 93 S Ct 2212; 37 L Ed 2d 88:

"We do not suggest that the Due Process Clause of its own force requires Oregon to adopt such provisions. *Cf. United States v Augenblick,* 393 US 348; 89 S Ct 528; 21 L Ed 2d 537 (1969); *Cicenia v Lagay,* 357 US 504; 78 S Ct 1297; 2 L Ed 2d 1523 (1958). But we do hold that in the absence of a strong showing of state interests to the contrary, discovery must be a two-way street. *The State may not insist that trials be run as a 'search for truth' so far as defense witnesses are concerned, while maintaining 'poker game' secrecy for its own witnesses."* (Emphasis added. Footnote omitted.)

Thus, what was feared by the Supreme Court in *Wardius* is not at all the situation here. If anything, the reverse is true. It was the prosecution who was unable to interview the witness until the day of the trial. There was no attempt to maintain secrecy as to the prosecution witness; indeed, as we have seen, there was nothing for them to "keep secret" until the very morning of trial.

Thus, for the reasons given by the court below and for the reasons we have added here, we believe the trial court ruled correctly in allowing the testimony of Detective Snyder.

Defendant next alleges that his conviction should be reversed because there was insufficient evidence on the element of "entering" to warrant a finding of guilty by the jury. In support of his argument defendant cites several cases from other jurisdictions. But these cases are of no help to defendant since they unanimously involve situations where there remained a final barrier to entry into the premises in question. There was no such barrier present in this case. The plastic which covered the window had been removed. The window glass itself had been shattered. Several bottles of wood stain which had been on the window sill inside the window were found on the ground outside of the building. Finally, a wooden bar, which was part of the burglar alarm system for the building, had been removed. Defendant argues that the wooden bars were actually the final barrier to entry, and thus the prosecution was bound to prove that there had been a penetration of that barrier. Defendant's position is untenable. First, the bars, even assuming that their purpose was to prevent entry rather than detect it, were insufficient to accomplish this purpose. It is a well established doctrine that "[w]here an entering is a

necessary element of the offense, it is sufficient if any part of defendant's body is introduced within the house". 3 Gillespie, Michigan Criminal Law & Procedure (2d ed), § 1133, p 1528. Thus, if a defendant were to stick his arm through a window, this would constitute an entry. Similarly, if a defendant were to stick his arm through a space between two bars, this would constitute an entry. For this reason, defendant's theory that the bars were an absolute barrier to entry is without merit. Also, there was testimony at trial that the bars could be easily removed, and, in fact, they were purposely designed so that they could be easily removed, thus setting off the burglar alarm. In light of this, it cannot be said that the bars were a barrier to entry for purposes of defendant's argument.

We have examined defendant's other allegations of error and found them to be without merit.

Affirmed.