**STATE of South Dakota, Plaintiff and Respondent,**

v.

**Harold Frederick REIMAN, Robert G. Graham, Jeffery G. Onstott, Alan N. Elliott, Defendants and Appellants.**

**Nos. 12451, 12461 to 12463.**

Supreme Court of South Dakota.

Argued May 16, 1979.

Decided Oct. 31, 1979.

Margaret Crew, Asst. Atty. Gen., Pierre, for plaintiff and respondent; Mark V. Meierhenry, Atty. Gen., Pierre, on the brief.

John R. Kabeiseman of Brady, Kabeiseman, Reade, Abbott & Johnson, Yankton, for defendant and appellant Reiman.

Steven M. Johnson of Brady, Kabeiseman, Reade, Abbott & Johnson, Yankton, for defendant and appellant Graham.

William J. Klimisch of Goetz, Hirsch, Haar & Klimisch, Yankton, for defendant and appellant Onstott.

John T. Porter of Doyle, Beirle & Porter, Yankton, for defendant and appellant Elliott.

FOSHEIM, Justice.

All four defendants were charged, tried and convicted of rape and kidnapping. Motions for new trials were denied. All defendants appeal from the judgments entered. They raise numerous assignments of error which will be grouped for discussion. We affirm the rape convictions of all defendants and the kidnapping convictions of defendants Reiman and Graham. We reverse the kidnapping convictions of defendants Onstott and Elliott.

According to the state's evidence, on August 22, 1977, the complaining witness and two other young women smoked marijuana and drank beer before driving to Fordyce, Nebraska for dinner. They returned to Yankton and went to the Cock-a-Too Bar. The prosecutrix remained at the bar later than her companions, and departed shortly after midnight. Upon leaving, she saw a vacant van with an open side door parked in front of the bar. She testified that a man behind her made a comment and she was then shoved inside the van through the open side door. She asked to be released. Two other men then occupied the front seat of the van and one of them drove it away. The man who pushed her into the van had her pinned with his arms. When she attempted to get out the door, he grabbed her by the hair. The evidence indicates that the driver was the defendant Reiman and the front seat passenger was the defendant Graham. The man in the back was not identified and was indicted by the grand jury as "John Doe." The van was driven

into a building with open doors. The driver and passenger got out of the van and "John Doe" then began to molest the victim and pulled her from the vehicle. She fought with him. At John Doe's request, defendant Elliott and another unidentified man came to his assistance. Her assailants, including defendant Onstott, forced the victim upon a mattress with a sheet on it, removed her clothing, and for over four hours forced her to have oral and vaginal sex. During the assault, the victim was struck numerous times. At one point, she managed to get away and ran toward a light which she said was in a bathroom. The bathroom had a mirror with red designs on it similar to the state's exhibit which was removed from the paint shop of defendant Reiman where the assault was alleged to have occurred. She testified that all of the defendants raped her that night. After the assault ended, she was released within a few blocks of her residence.

The complaining witness was examined by her doctor on the day of the assault. She told him she had been raped by six men after being forced into a van. It was the impression of the doctor that she had been raped, due to her physical and emotional condition. She was upset, trembling and afraid. There were bruises on her legs, arms, back, and face. Her sexual organs were swollen and tender. There was a fluid in the vagina which, in the doctor's opinion, was semen. The doctor, based upon his findings, concluded that more than one man had been involved.

Later on August 23, 1977, the prosecutrix visited the Yankton County Sheriff's Office and gave descriptions of four of her assailants. Defendants denied the charges; they all, however, admitted their presence at the Cock-a-Too Bar on the evening of August 22, and at the Outasite Paint Shop during the early morning hours of August 23. The paint shop where the rape allegedly was committed was operated by defendant Reiman. We will first review the challenged pretrial procedures.

It is urged that the trial court erred in failing to proceed with scheduled and demanded preliminary hearings concerning complaints which were filed against all four defendants. Defendants Reiman, Onstott, and Elliott were arrested with separate warrants on complaints signed by the sheriff of Yankton County. These complaints, dated September 1, 1977, charged defendants with the crimes of rape and kidnapping. On September 2, 1977, defendant Graham was arrested pursuant to a warrant based on a complaint which also charged the crimes of rape and kidnapping. All four defendants appeared before a law-trained magistrate, and September 6, 1977, was set as the time for a preliminary hearing for all four defendants on all charges. On September 3, without notice to defendants or their appointed legal counsel, the state convened a grand jury for the purpose of investigating this alleged criminal activity. The grand jury returned separate indictments against all four defendants, charging each with the crimes of rape and kidnapping. On September 6, 1977, the defendants appeared by counsel for the scheduled preliminary hearings, but none were held. On September 12, 1977, a circuit judge granted motions made by defendants Graham and Onstott to quash the grand jury indictments dated September 3, 1977. The judge further ordered that defendants Graham and Onstott be present before the law-trained magistrate on September 13, 1977, for purposes of setting a date for a preliminary hearing on the original complaints. On September 13, 1977, defendants Graham and Reiman filed applications for writs of habeas corpus. Prior to the hearing on the writs, all four defendants were served with warrants of arrest and complaints alleging the same crimes of rape and kidnapping. The circuit judge granted the writs of habeas corpus up to the point of the arrest of such defendants on the second set of warrants and complaints. This, in effect, kept defendants in custody on the warrants dated September 13, 1977. Preliminary hearings for all four defendants concerning these complaints were scheduled for September 15, 1977, at 4:30 p. m. On September 14, 1977, a new grand jury was assembled and returned a joint indictment

charging all four defendants and "John Doe" each with the crimes of rape and kidnapping. On September 15, 1977, the second set of arrest warrants and complaints against defendants Reiman, Graham, and Onstott was dismissed and the preliminary hearing scheduled for that day before the law-trained magistrate (the second preliminary hearing scheduled) was cancelled. Defendants remained in custody and went to trial on the second grand jury indictments.

South Dakota law provides that criminal actions may be commenced by indictment, information, and complaint.[1] The defendants complain that scheduled preliminary hearings were not held. While a defendant cannot be held on an information in this state unless there has been a preliminary hearing or the defendant has waived such a hearing, SDCL 23–36–1,[2] there is no similar requirement concerning indicted defendants. Once the grand jury has found probable cause, a preliminary hearing is not required. *State v. Serl,* 269 N.W.2d 785 (S.D.1978); 21 Am.Jur.2d Criminal Law § 442 (1965). The indictments here rendered defendants' requests for a preliminary hearing moot and were not violative of due process or equal protection rights. *State v. Mastrian,* 285 Minn. 51, 58, 171 N.W.2d 695, 701 (1969) *cert. denied,* 397 U.S. 1049, 90 S.Ct. 1381, 25 L.Ed.2d 662 (1970). See also, *State v. Franklin,* 163 N.W.2d 437 (Iowa 1968).

Pursuant to SDCL 23–42–4, the defendants were prosecuted jointly.[3] They contend the trial court erred in refusing to grant them separate trials. They claim the appearance of the four defendants with their attorneys all gathered around two counsel tables impressed upon the jury that the guilt of one meant the guilt of all. Whether to grant separate trials is a determination that lies within the discretion of the trial court, and we will not disturb the trial court's decision absent a showing of abuse of discretion. *State v. Bonrud,* 246 N.W.2d 790 (S.D.1976).

Appellants' argument would apply to any joint prosecution and require for the sake of appearance that each defendant jointly charged with participating in any group crime must on demand be tried separately. Since all defendants charged with a felony must be present at the trial[4] and will likely have counsel, an appearance of togetherness is perhaps unavoidable in any joint prosecution. Primarily for reasons of economy of time in judicial administration, the general rule has evolved that persons jointly indicted should be tried together, and this is particularly applicable where, as here, one crime may be proved against two

1. SDCL 23–32–2 states:

   Criminal actions are commenced in the circuit court by the filing of an indictment, by the filing of an information founded upon a preliminary examination, or by the filing of a complaint in cases not requiring the intervention of a grand jury or a preliminary examination.

   This statute was repealed by 1978 S.D.Sess. Laws, ch. 178, § 577, effective July 1, 1979. See SDCL 23A–8–1 (Special Supp.1978).

2. SDCL 23–36–1 states in part:

   The indictment or information must be set aside by the court in which the defendant is arraigned, and upon his motion, in any of the following cases:

   . . . . .

   (5) When the defendant has not had a preliminary examination before the information is filed, as provided by §§ 23–20–2 and 23–20–3.

   This statute was repealed by 1978 S.D.Sess. Laws, ch. 178, § 577, effective July 1, 1979. See SDCL 23A–8–2 (Special Supp.1978) for similar reenactment.

3. SDCL 23–42–4 provides:

   When two or more defendants are jointly charged with a felony they shall be prosecuted jointly; provided that the court may, in its discretion, on application duly made, prior to trial, direct that separate trials be had.

   This statute was repealed by 1978 S.D.Sess. Laws, ch. 178, § 577, effective July 1, 1979. See SDCL 23A–11–1, 2 (Special Supp.1978) for similar reenactment.

4. SDCL 23–42–1 provides:

   If the indictment or information is for a felony, the defendant must be personally present at the trial.

   This statute was repealed by 1978 Sess.Laws, ch. 178, § 577, effective July 1, 1979. See SDCL 23A–39–1 (Special Supp.1978) for similar reenactment.

or more defendants from the same evidence. *United States v. Shuford,* 454 F.2d 772 (4th Cir. 1971). Notwithstanding the need for efficiency, a joint trial is inappropriate if it sacrifices a defendant's right to a fair trial. *Baker v. United States,* 329 F.2d 786 (10th Cir. 1964), *cert. denied,* 379 U.S. 853, 85 S.Ct. 101, 13 L.Ed.2d 56 (1964). A separate trial should be granted where co-defendants have made serious statements implicating other co-defendants and the possibility plainly exists that such statements will be introduced as evidence in the trial. Such conditions may force a defendant in many cases to take the stand unwillingly to defend himself against such statements. *Baniszewski v. State,* 256 Ind. 1, 261 N.E.2d 359 (1970). A severance is also obligatory where one defendant's case rests heavily on the exculpatory testimony of a co-defendant who, though willing to give such testimony, fears that by taking the stand in the joint trial he would jeopardize his own defense. *United States v. Echeles,* 352 F.2d 892 (7th Cir. 1965). In the instant case, no such conflicts are apparent. The defendants supported the alibis of co-defendants and they all denied the presence of the complaining witness at the Outasite Paint Shop.

The defendants, Graham, Onstott and Elliott, further claim they were prejudiced by a joint trial with the defendant Reiman because he had a record of previous felony convictions. Evidence of such convictions was relevant only to determine the credibility of Reiman as a witness and the trial court properly instructed the jury concerning its limited purpose. *State v. Furlow,* 260 N.W.2d 631 (S.D.1977); *Flathers v. Wilson & Co.,* 62 S.D. 548, 255 N.W. 149 (1934).[5] In the absence of a more particularized showing of any possible prejudice, we conclude that the trial court did not abuse its discretion in denying the motion for separate trials. *State v. Runge,* 263 N.W.2d 876 (S.D.1978); *State v. Strickland,* 87 S.D. 522, 211 N.W.2d 575 (1973).

The defendants Reiman, Graham, and Onstott claim they were prejudiced because when one of the defendants filed an affidavit for change of judge, that judge was replaced as to all defendants. A defendant has the right to remove a judge from the trial of a case if he feels he cannot have a fair and impartial trial before the named judge. SDCL 15–12–26.[6] A judge may also disqualify himself without an affidavit for change of judge having been filed. SDCL 15–12–37. In order to have a joint trial and, at the same time, give effect to the defendants' right to change, each defendant was allowed to file one affidavit for a change of judge. The defendants Reiman, Onstott and Elliott filed separate affidavits against different judges. Each affidavit was then regarded as the basis for a judge's disqualification as to all four defendants. Having disqualified a judge, the right to secure a change ends and does not extend to the selection of a replacement. The power of replacement, depending on the circumstances, is vested in the presiding judge or senior judge of the circuit, SDCL 15–12–32, or the Chief Justice of the Supreme Court, SDCL 15–12–35. It follows that no defendant jointly prosecuted can claim prejudice because the replacement may not be the same judge who likely would have presided at his trial had he been prosecuted separately. The procedure followed allowed the defendants more independence than if they had been united in interest and required to join in a single

5. See South Dakota Pattern Jury Instruction 1–17–10.

6. SDCL 15–12–26 states:

An affidavit for change of judge or magistrate shall state the title of the action and shall recite that the affidavit is made in good faith and not for the purpose of securing delay, that in the ordinary course of litigation such action or some issue therein is expected to come on for trial before such judge or magistrate sought to be disqualified; that the party making such affidavit has good reason to believe and does actually believe that such party cannot have a fair and impartial trial before the named judge or magistrate. Only one judge or magistrate shall be named in such affidavit. It shall not be necessary to state in such affidavit the ground or reason for such belief.

affidavit pursuant to SDCL 15–12–23.[7] We find no prejudice to the rights of the defendants in the selection of the trial judge.

The defendants claim the trial court erred in refusing to change the place of trial from Yankton County. The motions for change of venue were based on general allegations of community prejudice against defendants generated by pretrial publicity.

The trial court may order a change of venue if it appears that a fair and impartial trial cannot be had in the county where the prosecution is pending. SDCL 23–28–7 (Repealed by 1978 S.D.Sess.Laws, ch. 178, § 577, effective July 1, 1979. See SDCL 23A–17–5 (Special Supp.1978) for similar enactment). Generally, the law presumes that a defendant can receive a fair and impartial trial in the county in which the offense was committed. 21 Am.Jur.2d Criminal Law § 424 (1965). The burden of establishing that a fair and impartial trial cannot be had in such county is upon the applicant. *State v. Austin*, 84 S.D. 405, 172 N.W.2d 284 (1969).

The decision with regard to whether there shall be a change of venue is within the discretion of the trial court and, as is true of most matters involving the exercise of that discretion, "the denial of a change of venue usually presents a question not free from doubt and difficulty." *State v. McNabb*, 60 S.D. 431, 244 N.W. 651 (1932). Unless that discretion has been abused, however, we will not reverse the decision of the trial court. *State v. Kingston*, 84 S.D. 578, 174 N.W.2d 636 (1970); *State v. Austin*, supra; *State v. Belt*, 79 S.D. 324, 111 N.W.2d 588 (1961).

An examination of the pretrial publicity discloses that it was, for the most part, factual reporting. Most of what was published involved matters that were subsequently received in evidence. The tone was not designed to create prejudice against the defendants. The news media made no expressions concerning its view of the guilt or innocence of the defendants and generally followed recognized fair trial and free press standards.[8] There is no showing that the pretrial coverage was inaccurate, misleading or unfair. A specific incident of which the defendants complain was a statement by the prosecuting attorney in support of the state's motion to increase the appearance bonds. The statement, published as a quotation, was legitimate argument in support of the motion. We find no request in the record that the hearing be held in camera.

When the motions for change of venue were denied, the trial judge indicated he would reconsider the ruling if difficulty was encountered selecting an impartial jury. During the *voir dire* examination, the defendants did renew their motions to change the venue. In *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), it was pointed out that the *voir dire* examination is an indicator of hostility to the accused. See also: *Hoppe v. State*, 74 Wis.2d 107, 246 N.W.2d 122 (1976); *People v. Freeman*, 16 Mich.App. 63, 167 N.W.2d 810 (1969). The trial court had the benefit of the intangible manifestations of impartiality or partiality reflected by the appearance, conduct and demeanor in the courtroom of the jury panel and the public, *State v. Belt*, supra, and was in a better position to know local sentiment. *Williamson v. Erickson*, 354 F.Supp. 1130 (D.S.D.1973). The court excused for cause those prospective jurors who stated they had formed an opinion on the issues in the case, and concluded that a fair and impartial jury had been selected. The test is whether there is, in fact, prejudice in the minds of the inhabitants of the county sufficient to raise a reasonable apprehension that the accused will not receive a fair and impartial trial in

7. SDCL 15–12–23 states:

> All parties who are united in interest or representation must unite in the filing of an affidavit for change of judge or magistrate and the filing of such affidavit by one party is deemed to be filed by all of such parties.

8. See: ABA Project on Minimum Standards for Criminal Justice; Standards Relating to Fair Trial and Free Press (1968).

the county. *State v. Meservey,* 53 S.D. 60, 220 N.W. 139 (1928). The United States Supreme Court has held that qualified jurors need not be ignorant of facts and issues and that the existence of pretrial publicity alone is not enough to deny a defendant a fair trial. *Murphy v. Florida,* supra. The pretrial publicity involved here did not approach the prejudice that existed in *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), or the "Roman Holiday" setting condemned in *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), where pretrial publicity covered many prejudicial items which were never received in evidence.

The defendants failed to show that a fair trial could not be had in Yankton County, and we accordingly cannot conclude that the trial court abused its discretion in failing to change the venue.

Prejudice is claimed because the sheriff of Yankton County, who apprehended the defendants and secured evidence against them, was a member of the group which drew the panel from which the grand jury was selected. As we noted in *Orricer v. State,* 85 S.D. 293, 181 N.W.2d 461 (1970), the participation of the sheriff in that activity is provided for in SDCL 16–13–16[9], if the grounds urged do not disqualify him from acting under SDCL 16–13–24.[10] The record reveals no grounds for disqualification or any wrongful act by the sheriff or other persons in drawing names for the jury panel. In the absence of any showing that the defendants were prejudiced by the sheriff's participation in the statutory selection process, their argument is without merit. *Orricer v. State,* supra; *State v. Sitts,* 71 S.D. 494, 26 N.W.2d 187 (1947).

It appears that the victim was voluntarily examined by two psychiatrists at the instance of the state. The state was directed by the court and agreed to furnish any reports to the defendants. According to the record, no reports of such examination were received.

The defendants contend that the trial court wrongfully refused their request for an independent psychiatric evaluation of the prosecuting witness concerning her mental stability and drug dependence, and that they were prejudiced because no reports of the mental examination voluntarily conducted were obtained and delivered. The purpose of a psychiatric examination in cases involving sex offenses is to detect any mental or moral delusions or tendencies causing distortion of the imagination which would affect the probable credibility of the complaining witness. *State v. Klueber,* 81 S.D. 223, 132 N.W.2d 847 (1965). As we noted in *Klueber,* however, it is not necessary or advisable for courts to go to the extreme, suggested by Dean Wigmore, that in all cases charging sex offenses, the complaining witness should be examined before trial by competent psychiatrists. Whether a psychiatric examination of the complaining witness in a sexual offense case should be ordered is within the sound discretion of the trial court and should be granted only upon a substantial showing of need and justification, which is not a light burden. *State v. Schweitzer,* 84 S.D. 384, 171 N.W.2d 737 (1969); *State v. Klueber,* supra.

**9.** SDCL 16–13–16 provides in part:

The register of deeds, county treasurer, and sheriff, or their substitutes as designated by § 16–13–24, upon like notice as provided by § 16–13–25 shall meet at the office of the clerk of courts not later than December first of each year. They shall compare the tickets prepared by the clerk with prospective juror lists furnished by the board of jury selectors and verify any names stricken pursuant to § 16–13–15. The tickets for each jury district, separately, shall be placed in a drawing box or jury wheel, shall be thoroughly mixed, and the register of deeds, treasurer, and sheriff, or those acting for them, shall in rotation draw the number of names apportioned to such jury district.

**10.** SDCL 16–13–24 provides:

If the register of deeds, treasurer, or sheriff be a party to a suit pending in the court for which the panel is to be drawn, or be suspended from office, or otherwise unable to act, such officer shall be deemed disqualified and in his place the circuit court shall by order provide for a substitute and the notice of the drawing shall be served upon the substitute.

While this is a sex offense case and the evidence shows the complaining witness smoked marijuana and consumed some alcohol preceding the crime, it does not reach the required showing. There was no evidence that special safeguards were necessary to protect the defendants from being the victims of fantasy or psychic complex. *State v. Parker*, 263 N.W.2d 679 (S.D.1978). See Annot., 20 A.L.R.3d 684 (1968). In *State v. Schweitzer*, supra, we held inadequate a showing much stronger than that in the present case. Accordingly, the defendants were not prejudiced by the refusal of the trial court to order an independent psychiatric examination or by the failure of the state to obtain and produce a report from the examinations voluntarily conducted.

We next turn to the trial itself. It was revealed during the trial upon cross-examination of the deputy sheriff of Yankton County that on October 25, 1977, he received a fingerprint report which stated that no fingerprints of the complaining witness or of the defendants Graham, Onstott, or Elliott were found at the scene of the crime. The prints were taken from the refrigerator near the main entrance and from the bathroom mirror. Deputy Hunhoff inadvertently failed to give a copy of this report to the prosecution until December 15, 1977. The defense received a copy the following day. The defendants claim the trial court erred in not granting a mistrial or a continuance to allow them to obtain the appearance of the FBI expert who made the analysis and prepared the report.

The court had previously ordered the results of the fingerprint analysis, together with any evidence exculpatory in nature, to be disclosed by the state to the defendants. The prosecution had also independently agreed to do so. Suppression by the prosecution of evidence favorable to an accused upon request violates the due process provisions of the Constitution where the evidence is material either to guilt or punishment irrespective of the good or bad faith of the prosecution. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Geelan v. State*, 85 S.D. 346, 182 N.W.2d 311 (1970). Regarding compliance with an order to produce, we said in *State v. Sahlie*, 245 N.W.2d 476, 478 (S.D.1976): "[O]nce the trial court, in its discretion, has ordered production of certain evidence, those orders must be expeditiously carried out and obeyed." The fact that the exculpatory evidence was fully revealed during the trial, however, mitigates the effect of the oversight. Had the report been timely produced, the most it was capable of telling the jury was that no fingerprints from the victim or the defendants Onstott, Elliott and Graham were found at the scene of the crime. That, together with the fact that it was not timely delivered, was fully disclosed at the trial in a manner perhaps more favorable to the defendants than if it had been properly produced. Neither can we see how the defendants Graham, Onstott and Elliott were prejudiced by the court refusing to grant a continuance so that they could obtain the appearance of the FBI expert who analyzed the prints. The most favorable testimony the expert could give was that, indeed, he found, no fingerprints of the prosecutrix or of these defendants. Again, this was admitted. Consequently, the defendants have not established that the belated disclosure was material to the issue of guilt. If it was not material, it could not be violative of due process. *State v. Parker*, 263 N.W.2d 679 (S.D.1978); *State v. Kietzke*, 85 S.D. 502, 186 N.W.2d 551 (1971). The facts here are distinguishable from the conduct condemned in *State v. Sahlie*, supra, where the state failed to produce a fingerprint tab prior to trial as the court had ordered. As a result, it appears the jury never was informed of the exculpatory fact that no identifiable fingerprints were found at the scene of the crime. We there held that due process cannot be satisfied unless the defendant is provided some opportunity to examine possible exculpatory evidence long enough before trial to determine if the evidence is or is not exculpatory. However, this due process urgency does not exist when the state's witnesses fully concede and reveal at the trial the exculpatory na-

ture of the evidence. In *Sahlie*, there were numerous violations of the court's order and the cumulative effect of those violations was noted. *State v. Sahlie* is modified, however, to the extent it indicates that failure to produce exculpatory evidence as ordered is, without exception, prejudicial error.

The next question is whether the trial court erred by not granting a mistrial when the state submitted evidence in rebuttal to defense alibi witnesses without giving the notice required by statute.[11] Mike Hevle testified that on August 23, 1977, he passed the Outasite Paint Shop at 4:00 A.M., but saw no vehicles. He further testified that he then saw the defendant Graham's car in the parking lot of the County Kitchen and that he saw the defendants Graham and Reiman sitting inside the restaurant. The state put on two witnesses in rebuttal. Richard Putnam, the manager of National Alfalfa testified from business worksheets that Mike Hevle was working for National Alfalfa from 6:00 P.M. on August 22, 1977, until 6:00 A.M. on August 23, 1977. That period covers the time at which the alibi witness testified that he saw the defendants Graham and Reiman together. Linda Hevle testified that her ex-husband, Mike Hevle, told her that defendant Graham had asked him for an alibi which would require him to commit perjury. Although it is not clear from the record, it appears the alibi notice was received by the state on or about December 16, 1977, which did not comply with the statute.[12] Since the trial commenced on December 12 and ended on December 21, 1977, the prosecution was unable to serve upon the defendants the required five-day notice of rebuttal witnesses. Under similar circumstances, it was held in *People v. Gilman*, 66 Mich.App. 419, 239 N.W.2d 396 (1976), that it would have been absurd to require the prosecution to give the required notice. The state here made no objection to the introduction of the alibi evidence. Similarly, the defendant Graham failed to object to the testimony of Richard Putnam and Mrs. Hevle. Generally, an objection to evidence must be made as soon as the opponent is aware of its objectionable nature and failure to object at a time when the court can take corrective action waives any later objection to the same evidence. *Holmes v. State*, 76 Wis.2d 259, 251 N.W.2d 56 (1977).

Furthermore, since Reiman and Graham both testified they were at the Outasite Paint Shop during the early morning hours of August 23, it is difficult to see how the testimony of Mike Hevle could provide an alibi for Graham. Without impeaching the defendants Reiman and Graham, all that the testimony of Mike Hevle refuted was the victim's claim that the assault continued for more than four

11. SDCL 23-37-5.1 states:

> Not less than five days after receipt of defendant's witness list, and at all times thereafter and before trial as subsequent names become known to the state, or such other times as the court may direct, the state's attorney shall file and serve upon the defendant the names and addresses, as particularly as are known to the state's attorney, of the witnesses the state proposes to offer in rebuttal to discredit the defendant's alibi at the trial of the cause.

This statute was repealed by 1978 S.D.Sess. Laws, ch. 178, § 577, effective July 1, 1979. See SDCL 23A-9-2 (Special Supp.1978) for similar reenactment.

12. SDCL 23-37-5 states:

> If the defendant in a criminal action proposes to rely in any way on alibi evidence, he shall, not less than ten days before the trial of the case, file and serve upon the court and state's attorney a written notice of his purpose to offer such evidence, which notice shall state specifically the place or places where the defendant claims to have been at the time or times of the alleged offense together with the name and residence or business address of each witness upon whom the defendant intends to rely for alibi evidence. If the defendant fails to file and serve such notice, he shall not be permitted to introduce alibi evidence at the trial of the case unless the court for good cause orders otherwise.
>
> As used in this section, "alibi evidence" means evidence that the defendant in a criminal action was, at the time of commission of the alleged offense, at a place other than the place where such offense was committed.

This statute was repealed by 1978 S.D.Sess. Laws, ch. 178, § 577, effective July 1, 1979. See SDCL 23A-9-1 (Special Supp.1978) for similar reenactment.

hours. That is not alibi evidence. Alibi evidence must show that the accused could not have committed the alleged crime, because at the time of its commission he was at a place other than where such offense was committed. SDCL 23-37-5. Other than SDCL 23-37-5.1, there is no requirement that notice of rebuttal witnesses be given. *State v. Hamm*, 89 S.D. 507, 234 N.W.2d 60 (1975); *State v. Butler*, 71 S.D. 455, 25 N.W.2d 648 (1946).

The defendant Graham argues that his in-court identification by the complaining witness should have been suppressed because the out-of-court process by which she identified him was so suggestive that it violated his due process rights. On September 1, 1977, the victim was taken by law enforcement officials to a construction site to observe the defendant Graham. From the vehicle, she viewed two men from a distance of about forty yards. She was unable to identify the defendant Graham from that distance so she was given a pair of binoculars with which she continued to view the suspect. She concluded that he resembled one of her assailants; however, she could not be certain because he was wearing coveralls and a hard hat. The man she remembered was balding toward the front of his head. That evening the prosecutrix was driven by an officer past a garage where she could again see this defendant. After two or three passes she was "ninety percent" certain, but still wanted a closer look at the man. The defendant Graham was then arrested and taken to the Public Safety Building. He was put in a room with two officers that were involved in the investigation and the victim observed him through a glass door. Upon thus viewing him, she was able to see his bald head and identified a tattoo on his left arm. She testified that this crystallized the identification in her mind.

The practice of showing suspects singly to persons for purposes of identification has been consistently condemned as an affront to the requirements of due process and good police procedure. *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *State v. Keeling*, 89 S.D. 436, 233 N.W.2d 586 (1975). The considerations against approval of such "show-ups" are particularly compelling where the victim is the witness. *United States v. Wade*, supra. The primary evil to be avoided is "a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247, 1253 (1968).

Granting the primary illegality of the identification procedure employed in this case, however, the in-court identification can be sanctioned if it is established that, under the totality of the circumstances, it has been purged of any taint arising from the out-of-court identification. *United States v. Wade*, supra. Such a determination requires:

> [C]onsideration of various factors: For example, the prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any prelineup description and the defendant's actual description, any identification prior to lineup of another person, the identification by picture of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification.

*United States v. Wade*, 388 U.S. at 241, 87 S.Ct. at 1940, 18 L.Ed.2d at 1165. See also: *Neil v. Biggers*, supra; *State v. Keeling*, supra.

Applying these criteria to the present case, we find that the questionable out-of-court identification procedures to which defendant Graham was subjected did not amount to a deprivation of his due process rights. While we do not sanction the pretrial identification procedures here employed, numerous factors indicate that any taint associated with the out-of-court identification was purged.

The victim in this case had an unusual opportunity to view the defendant over a period of several hours. In *Neil v. Biggers*, supra, the Court noted:

The victim spent a considerable period of time with her assailant, up to half an hour. She was with him under adequate artificial light in her house and under a full moon outdoors, and at least twice, once in the house and later in the woods, faced him directly and intimately. She was no casual observer, but rather the victim of one of the most personally humiliating of all crimes.

409 U.S. at 200, 93 S.Ct. at 382, 34 L.Ed.2d at 412.

In view of the circumstances, we can assume the witness' degree of attention was very high. *State v. Keeling*, supra. Whether there was a discrepancy between the description given to the sheriff and the actual appearance of the defendant Graham was debated. Any such discrepancies were not substantial, however, because only four descriptions were given when there were at least five assailants. Graham could thus have been completely omitted from the group of suspects described. The victim's reluctance to positively identify him until she was certain appears to have been prompted more by caution than doubt and indicates a high degree of witness reliability. When she ultimately observed his bald head and tatooed arm, the identification was complete in her mind. We noted in *State v. Barcley*, 88 S.D. 584, 225 N.W.2d 875 (1975), that a unique physical feature (in that case a drooping eyelid) renders identification easier for the witness. Finally, the lapse of time from the crime to the confrontation was ten days. We do not find this unreasonably remote. Cf., *Neil v. Biggers*, supra.

If we assume, however, that any taint arising from the out-of-court identification had not been purged, the in-court identification would nevertheless be admissible, provided the state proved by clear and convincing evidence that the in-court identification was of independent origin. *United States v. Wade*, supra; *State v. Sahlie*, 245 N.W.2d 476 (S.D.1976). The critical question is whether, prior to the improper station-house showup, "there was already such a definite image in the witness' mind that he is able to rely on it at trial without much, if any, assistance from its successor . . . [and] [i]n making this subtle determination much will depend on the witness' initial opportunity for observation and also whether he was motivated to make a careful observation of the perpetrator." *United States v. Follette*, 428 F.2d 912, 915 (2nd Cir. 1970), *cert. denied*, 400 U.S. 908, 91 S.Ct. 151, 27 L.Ed.2d 146 (1970).

The prosecutrix here had an excellent opportunity to observe her assailants over a period of several hours. She was not a casual bystander, "but rather the victim of one of the most personally humiliating of all crimes." *Neil v. Biggers*, 409 U.S. at 200, 93 S.Ct. at 382, 34 L.Ed.2d at 412. Under the circumstances, her motivation to note carefully the appearances of her attackers could not have been greater. It appears that her identification of all four defendants at trial was based upon a mental image indelibly fixed in her mind during the extended assault. As she stated at trial, "I'm positive it's these four. I can never forget their faces." While the positive attitude of a witness concerning the basis for an in-court identification "is to be weighed warily and in the realization that the most assertive witness is not invariably the most reliable one," *Clemons v. United States*, 133 U.S.App.D.C. 27, 39, 408 F.2d 1230, 1242 (D.C.Cir.1968), *cert. denied*, 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969), great weight "must be given to the determination of the judge who saw and heard the witness." *United States v. Follette*, supra, at 915. See *State v. Sahlie*, supra. We cannot say as a matter of law that the trial judge who made that observation erred in denying defendant Graham's motions concerning his in-court identification.

The trial court refused an instruction proposed by defendants Graham and Onstott to the effect that the crime of rape is easily charged and hence the testimony of the complaining witness should be viewed with caution. That refusal is claimed to be error. A similar instruction was given and challenged in *State v. Fulks*, 83 S.D. 433, 160 N.W.2d 418 (1968), wherein we noted

that such a cautionary instruction is ordinarily given in sexual crimes when the victim is the prosecuting witness, and that it is generally considered mandatory in rape cases where conviction may be sustained on the uncorroborated testimony of the complaining witness. The testimony of the victim here, however, was corroborated by that of the doctor and by physical evidence. Furthermore, the testimony of each defendant put them at the scene of the crime on the night it occurred. Evidence of opportunity to commit the crime of rape is corroboration, so far as it goes. *State v. Fehr*, 45 S.D. 634, 189 N.W. 942 (1922). Since the convictions need not be sustained on the uncorroborated testimony of the complaining witness, the proposed instruction was not mandatory.

Defendants claim the trial court erred in denying their motions to dismiss the kidnapping counts of the indictments for the reason that the alleged abduction of the prosecutrix was incidental to the crime of rape, and that there was insufficient evidence to support the alleged crime of kidnapping. SDCL 22–19–1 defines kidnapping as follows:

> Any person who shall seize, confine, inveigle, decoy, abduct or carry away any person and hold or detain such person, except in the case of an unmarried minor by a parent thereof, for any of the following reasons:
>
> . . . . .
>
> (2) To facilitate the commission of any felony or flight thereafter;
>
> (3) To inflict bodily injury on or to terrorize the victim or another;
>
> . . . . .

At the time of this offense, SDCL 22–22–1 defined, in part, the crime of rape as follows:

> Rape is an act of sexual penetration accomplished with any person under any one or more of the following circumstances:
>
> (1) Through the use of force, coercion or threats of immediate and great bodily harm against the victim or other persons within the victim's presence, accompanied by apparent power of execution;

There are two general and opposing views on the question whether the seizure or the detention of the victim of a rape is sufficient to constitute the separate crime of kidnapping. In 43 A.L.R.3d at page 701, the annotated cases are summarized as follows:

> One view is that the seizure or detention of the victim, with any accompanying movement, is necessarily sufficient to constitute the separate crime of kidnapping. The courts which have supported this view have reasoned that it was the fact of a forcible removal, . . . which constituted the separate crime of kidnapping. The other view, quite logically, is that the seizure or detention alone is not necessarily sufficient to constitute the separate crime of kidnapping. Here the courts reasoned that movements merely incidental to the commission of a rape, . . . and which did not substantially increase the risk of harm over and above that risk which was necessarily present in the rape, . . . did not constitute the separate crime of kidnapping. [Footnotes omitted.]

We have never had occasion to directly address this question. The cases which hold that seizure and detention of the rape victim is sufficient to constitute the separate crime of kidnapping rest on the fact, and not the distance, of the forcible removal. In rape cases, however, there is generally some seizure and removal aside from the forcible rape itself. *In Re Earley*, 14 Cal.3d 122, 120 Cal.Rptr. 881, 534 P.2d 721 (1975); *People v. Lynch*, 14 Cal.App.3d 602, 92 Cal. Rptr. 411 (1971). We find it unreasonable to sustain a conviction for kidnapping which is unsupported by evidence aside from acts incidental only to another crime. We reject, however, defendants' contention that any asportation of the victim must be considered only as an integral part of the crime of rape. Asportation or kidnapping is not necessarily involved in forcible rape. *Wilson v. State*, 253 Ind. 585, 255 N.E.2d

817 (1970); *Samuels v. State*, 253 A.2d 201 (Del.1969).

Defendants Reiman and Graham were involved in the seizure and removal of the victim from the Cock-a-Too Bar to the Outasite Paint Shop. Defendants Onstott and Elliott participated only in the rape. The movement of the victim compelled by Onstott and Elliott was no more than incidental to the commission of the forcible rape and did not substantially increase the risk of harm otherwise present. See *People v. Daniels,* 71 Cal.2d 1119, 80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677 (1969). Aside from that participation, there is a dearth of evidence from which the jury could find Onstott and Elliott aided or abetted in the crime of kidnapping. We conclude, therefore, that the charge of kidnapping should have been dismissed against defendants Onstott and Elliott.

We have reviewed the remaining assignments of error and find they are either without merit or unnecessary to decide in view of the conclusions we have reached.

The rape judgments are affirmed against all defendants. The kidnapping judgments are affirmed with regard to defendants Reiman and Graham and reversed with regard to defendants Onstott and Elliott.

WOLLMAN, C. J., and MORGAN and HENDERSON, JJ., concur.

DUNN, J., concurring in part and dissenting in part.

DUNN, Justice (concurring in part and dissenting in part).

I concur in the majority decision except as to defendant Graham. I would reverse the conviction of Graham for the reason that the complaining witness' "in-court identification" was tainted by the following: (1) the suggestion made by the complaining witness' friends that it was "Reiman and his friends" who committed the crimes charged; (2) the reputations of the defendants with law enforcement officials for alleged connection with some of the problem areas of Yankton; (3) the taking of the complaining witness by a construction site by law enforcement officials for the purpose of viewing defendant Graham and the failure of the complaining witness to identify him at the construction site; (4) the pointing out of other suspects by the complaining witness where no follow-up investigation took place; (5) the discrepancy between the description given to the police by the complaining witness and Graham's actual appearance, especially since the complaining witness indicated she remembered Graham most clearly; (6) the driving of the complaining witness by a garage where defendant Graham was standing with no other adults present "several times" in an effort to obtain a more positive identification; (7) the arrest of defendant Graham to allow for a one-man show-up at the Public Safety Center to secure a positive identification; (8) the lack of a formal lineup and the lack of counsel present during the identification procedures; and (9) the fact that the complaining witness did not identify defendant Graham until nine days after alleged rape and kidnapping, and only after three viewings of the defendant where he was "zeroed in on" by police as a possible suspect.

After this police procedure, it seems incredulous that the complaining witness' in-court identification had an origin independent of and untainted by these pretrial procedures.