Robert Gray GRAHAM, Appellee,

v.

Herman SOLEM, Warden, South Dakota State Penitentiary, and Mark V. Meierhenry, Attorney General, State of South Dakota, Appellants.

No. 82–1371.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 29, 1983.

Decided March 5, 1984.

Mark V. Meierhenry, Atty. Gen., Grant Gormley, Asst. Atty. Gen., Pierre, S.D., for appellants.

Sarah Richardson, Davenport, Evans, Hurwitz & Smith, Sioux Falls, S.D., for appellee.

Before LAY, Chief Judge, and HEANEY, BRIGHT, ROSS, McMILLIAN, ARNOLD, JOHN R. GIBSON, FAGG and BOWMAN, Circuit Judges, en banc.

Herman Solem, Warden of the South Dakota State Penitentiary at Sioux Falls, and Mark Meierhenry, Attorney General of South Dakota, appeal from a final judgment entered in the District Court for the District of South Dakota granting a writ of habeas corpus to petitioner Robert Graham.

For the reasons discussed below, the judgment of the district court is reversed.

Two issues were argued and submitted to the court sitting en banc: (1) whether *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982), should apply retroactively and (2) whether the district court erred in holding that the complaining witness' in-court identification of Graham was the result of impermissibly suggestive identification procedures, was unreliable, and therefore inadmissible. Because a different majority of the court decided each issue, a different member of the court prepared the majority opinion for each issue. The dissenting opinions immediately follow the majority opinion for each issue.

## I. EXHAUSTION

McMILLIAN, Circuit Judge, with whom ROSS, ARNOLD, JOHN R. GIBSON, FAGG and BOWMAN, Circuit Judges, join.

Petitioner Graham and his three co-defendants, Reiman, Onstott and Elliott, were tried and found guilty by a jury in state court of kidnapping and raping a Yankton, South Dakota, woman. All four defendants appealed to the South Dakota Supreme Court, which reversed Onstott and Elliott's kidnapping convictions, but upheld all the other convictions. *State v. Reiman*, 284 N.W.2d 860, 874 (S.D.1979). Petitioner Graham subsequently filed a petition for a writ of habeas corpus in the federal district court. The petition reiterates basically the same points made to the state supreme court. The district court granted the writ, holding that the use of the victim's identification of Graham at trial was a violation of Graham's federal constitutional right to due process. The state appealed, challenging both the district court's power to address the merits of the issues raised in Graham's petition and the district court's decision on the merits.

The first issue raised in this appeal is whether the United States Supreme Court's recent decision in *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379, requires us to dismiss Graham's habeas corpus petition. *Rose v. Lundy* held that federal district courts may not entertain habeas corpus petitions which contain both exhausted and unexhausted claims. *Id.* at 522, 102 S.Ct. at 1205. The state contends that Graham has failed to exhaust several of the nineteen claims raised in his habeas petition and, therefore, the entire petition must be dismissed. Graham's position is that he has exhausted all nineteen claims.[1] As an alternate argument, Graham maintains that this court should not apply *Rose v. Lundy* in his case because the district court issued the writ on the basis of a claim that was exhausted and did so before *Rose v. Lundy* was decided.

First, we determine whether the habeas petition before us contains any unexhausted claims.

### A. Exhaustion Requirement

A federal habeas petitioner satisfies the exhaustion requirement of 28 U.S.C. § 2254(b) (1976) when he either (1) has no other presently available state remedies to pursue or (2) has fairly presented the substance of his federal claims to the state's courts. *Moore v. Wyrick*, 668 F.2d 1007, 1009 (8th Cir.1982). Under South Dakota law, Graham still has post-conviction remedies available to him.[2] Thus, we must examine Graham's brief before the South Dakota Supreme Court to determine whether he fairly presented that court with an opportunity to pass upon the federal constitutional grounds of his claims.[3] Citation to a provision of the federal constitution or a case addressing the constitutional basis of the claim, or a discernible reference to a federal constitutional right is all that is

---

1. The district court held that Graham had exhausted all nineteen of the issues raised in his habeas corpus petition. *Graham v. Solem*, No. CIV80–4174, mem. op. at 4 (D.S.D. Feb. 16, 1982).

2. S.D. Codified Laws Ann. § 23A–34–1 through 34–23 (1979). *See Moore v. Wyrick*, 668 F.2d

1007, 1009 (8th Cir.1982); *Thomas v. Wyrick*, 622 F.2d 411, 414 (8th Cir.1980).

3. Only errors of federal constitutional significance are cognizable in federal habeas corpus review of a state conviction. *De Berry v. Wolff*, 513 F.2d 1336, 1338 (8th Cir.1975).

normally required. *Anderson v. Harless,* 459 U.S. 4, 103 S.Ct. 276, 277–78 & n. 3, 74 L.Ed.2d 3 (1982) (per curiam); *Morrow v. Wyrick,* 646 F.2d 1229, 1232 (8th Cir.), *cert. denied,* 454 U.S. 899, 102 S.Ct. 401, 70 L.Ed.2d 216 (1981); *Thomas v. Wyrick,* 622 F.2d 411, 413 (8th Cir.1980). In making this assessment, we must bear in mind that state courts, as co-equal guardians of constitutional rights, are able to recognize federal constitutional issues even when no explicit reference is made to the federal constitution. *See Rose v. Lundy,* 455 U.S. at 518, 102 S.Ct. at 1203.

▪ A review of Graham's state supreme court brief reveals that he has failed to exhaust issues 5, 6, 9, 10, 11, 14 and 15 raised in his petition for a writ of habeas corpus.[4] We are faced, therefore, with a mixed[5] habeas petition and must decide whether to apply *Rose v. Lundy* retroactively.

### B. Retroactivity of Rose v. Lundy

We are aware that almost all of the circuits have applied *Rose v. Lundy* retroactively. *See, e.g., Bowen v. Tennessee,* 698 F.2d 241, 242–43 (6th Cir.1983) (en banc); *Burns v. Estelle,* 695 F.2d 847, 851–52 & n. 2 (5th Cir.1983); *Gulliver v. Dalsheim,* 687

F.2d 655, 657 & n. 3 (2d Cir.1982); *Harding v. North Carolina,* 683 F.2d 850, 851–52 (4th Cir.1982); *Slotnick v. O'Lone,* 683 F.2d 60, 61 (3d Cir.1982), *cert. denied,* 459 U.S. 1211, 103 S.Ct. 1206, 75 L.Ed.2d 447 (1983); *Jones v. Hess,* 681 F.2d 688, 695 & n. 9 (10th Cir.1982); *United States ex rel. Clauser v. Shadid,* 677 F.2d 591, 593 (7th Cir.1982). *Contra Johnson v. Balkcom,* 695 F.2d 1320, 1322 (11th Cir.1983); *Niziolek v. Ashe,* 694 F.2d 282, 285–87 (1st Cir.1982).[6] We also are aware that this circuit has mixed opinions on the subject. *Compare Dunn v. Wyrick,* 679 F.2d 731, 733 (8th Cir.1982) (*Rose v. Lundy* will not be applied to habeas corpus petitions where exhausted claims have been fully litigated and decided in the federal district court prior to the *Rose v. Lundy* decision), *and Romano v. Wyrick,* 681 F.2d 555, 556 & n. 3 (8th Cir.1982) (mixed petition need not be dismissed in its entirety), *with Stewart v. Parratt,* 682 F.2d 757, 758 (8th Cir.1982) (remanding case to district court to reconsider in light of *Rose v. Lundy*).

This court's most recent opinion on the effect of *Rose v. Lundy* was *Richards v. Solem,* 693 F.2d 760, 763–64 (8th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1898, 77 L.Ed.2d 286 (1983). In *Richards,* the

---

**4.** In his state court brief (hereinafter referred to as State Brief), Graham cited either a specific federal constitutional provision or a case addressing the federal constitutional issue or both for each of the other nineteen issues: *Issue 1,* State Brief at 29–31; *Issue 2,* State Brief at 46–47; *Issue 3,* State Brief at 71–73 and *State v. Reiman,* 284 N.W.2d 860, 866 (S.D.1979) (raising the constitutional issue of guilt by association); *Issue 4,* State Brief at 54; *Issue 7,* State Brief at 55–56; *Issue 8,* State Brief at 59, 61–62; *Issue 12,* State Brief at 68–69; *Issue 13,* State Brief at 70 and citation to trial motion raising sixth amendment right to effective assistance of counsel at Tr. 2106–09; *Issue 16,* State Brief at 82 and citation to *State v. Billington,* 86 N.M. 44, 519 P.2d 140, 142 (1974); *Issue 17,* State Brief at 86 (reference made to right to cross-examination and "basic right of compulsory process"); *Issue 18, see State v. Reiman,* 284 N.W.2d at 865; *Issue 19,* State Brief at 87.

**5.** A habeas corpus petition is said to be "mixed" when it contains both claims which were fully exhausted in the state courts and those which were not fully exhausted in the state courts.

**6.** The United States Court of Appeals for the Fifth and Ninth Circuits adopted a total exhaustion rule before *Rose v. Lundy* was decided. *See Rose v. Lundy,* 455 U.S. 509, 513 n. 5, 102 S.Ct. 1198, 1201 n. 5, 71 L.Ed.2d 379 (1982). The Eleventh Circuit follows the Fifth Circuit precedent. *See Cosby v. Jones,* 682 F.2d 1373, 1376–78 (11th Cir.1982).

The Fifth Circuit's total exhaustion rule, as adopted by the Eleventh Circuit, had an exception, however: if the district court already reviewed the merits of a mixed petition, the petition would not be dismissed at the appellate level. *See Galtieri v. Wainwright,* 582 F.2d 348 (5th Cir.1978) (en banc). The Fifth Circuit has now concluded that this exception is no longer valid after *Rose v. Lundy,* even when the district court's decision was rendered before *Rose v. Lundy* was decided. *Burns v. Estelle,* 695 F.2d 847, 852 (5th Cir.1983). The Eleventh Circuit has taken the opposite position and has held that *Rose v. Lundy* is not to be applied retroactively. *Johnson v. Balkcom,* 695 F.2d 1320, 1322 (11th Cir.1983).

court chose to follow *Dunn* for three reasons: (1) *Dunn* was directly on point because it involved a district court judgment that denied the writ; (2) it felt *Dunn* was persuasive in arguing that retroactive application of the exhaustion requirement would waste judicial resources; and (3) non-retroactive application of *Rose v. Lundy* to the petition before it comported with the comity purpose of the total exhaustion rule because the federal district court and circuit courts in *Richards* agreed with the state courts that post-conviction relief should be denied. *See also Royal v. Wyrick,* 694 F.2d 525, 527 n. 2 (8th Cir.1982).

In following *Dunn,* the *Richards* panel stated that three post-*Rose v. Lundy* United States Supreme Court orders did not require a different result. *Richards,* 693 F.2d at 764. All three orders involved cases in which mixed habeas petitions were decided on the merits by the federal district and circuit courts before *Rose v. Lundy* was handed down. In two of these orders, *Duckworth v. Cowell,* 455 U.S. 996, 102 S.Ct. 1626, 71 L.Ed.2d 858 (1982), and *Rodriquez v. Harris,* 455 U.S. 997, 102 S.Ct. 1627, 71 L.Ed.2d 858 (1982), the Court granted certiorari, vacated the judgment, and remanded the case to the court of appeals with instructions to direct the district court to dismiss the petition for writ of habeas

corpus. In the third case, *Bergman v. Burton,* 456 U.S. 953, 102 S.Ct. 2026, 72 L.Ed.2d 478 (1982) (order), the Court vacated the judgment and remanded the case to the court of appeals for further consideration in light of *Rose v. Lundy.* The Supreme Court's orders in *Duckworth* and *Rodriquez,* which direct the lower courts to apply the total exhaustion rule to cases decided before *Rose v. Lundy,* permit no other conclusion than that the Supreme Court is applying *Rose v. Lundy* retroactively.[7]

The *Richards* panel, however, distinguished these cases because they all involved lower federal court decisions which *granted* the writ of habeas corpus, while in *Richards,* the writ was denied. The reasoning implicit in this distinction is that the failure to retroactively apply the total exhaustion rule to cases that granted the writ would create the kind of federal-state friction assailed in *Rose v. Lundy,* yet no such friction would be generated when the federal court agrees with the state courts in denying post-conviction relief. Thus, while all the reasons militating against the total exhaustion rule are present in cases in which the federal court has already agreed with the state courts on the merits, none of the purposes justifying the total exhaustion

---

**7.** In *Bergman v. Burton,* 456 U.S. 953, 102 S.Ct. 2026, 72 L.Ed.2d 478 (1982) (order), the Supreme Court vacated the judgment below and ordered the court of appeals to further consider the case in light of *Rose v. Lundy.* The panel in *Richards v. Solem,* 693 F.2d 760 (8th Cir. 1982) *cert. denied,* —— U.S. ——, 103 S.Ct. 1898, 77 L.Ed.2d 286 (1983), found that the Court's failure to order the petition dismissed shows that in some situations retroactive application of the total exhaustion rule is discretionary. In *Bergman,* however, the court of appeals had never reached the question of whether or not there was a mixed petition before them because the Supreme Court raised the issue *sua sponte. Burton v. Bergman,* 649 F.2d 428, 429, 432 (6th Cir.1981), *vacated and remanded,* 456 U.S. 953, 102 S.Ct. 2026, 72 L.Ed.2d 478 (1982) (order). On remand the court of appeals remanded the case to the district court for further consideration in light of *Rose v. Lundy. Burton v. Bergman,* 703 F.2d 559 (6th Cir.1982). On remand to the district court, the petitioner amended his petition to delete the issue the district court had previous-

ly held was unexhausted. The district court then granted the writ of habeas corpus with leave given to the government to re-try petitioner. *Burton v. Bergman,* No. 78–71968 (E.D.Mich. Nov. 8, 1982). Thus, the petitioner, the district court, and the court of appeals all understood that *Rose v. Lundy* was to be applied retroactively. Even the Supreme Court dissenters in *Bergman* realized that the total exhaustion rule would have to be applied retroactively. As Justice Stevens wrote in dissent: "Under *Rose v. Lundy*—if I read the Court's opinion correctly—after the case gets back to the District Court, that court must dismiss the habeas corpus petition that is now a part of the record." *Bergman,* 456 U.S. at 954, 102 S.Ct. at 2028 (footnote omitted).

We realize that summary orders by the Supreme Court have less precedential value than full opinions. But these summary orders do exist as evidence of what the Supreme Court intended by issuing its *Rose v. Lundy* opinion in such simple, straightforward mandatory language. *See Burns v. Estelle,* 695 F.2d 847, 851 (5th Cir.1983).

rule would be served by retroactively applying *Rose v. Lundy* to such cases.

■ This distinction has the force of logic behind it, but it overlooks the fact that both the district court and the court of appeals in *Rodriquez denied* the petition for writ of habeas corpus. *See Rodriquez v. Harris,* No. 79–CIV–4177 (S.D.N.Y. July 9, 1980) (order adopting magistrate's recommendation to deny the writ), *aff'd mem.,* 659 F.2d 1062 (2d Cir.1981). The Supreme Court's order that the total exhaustion rule must be applied even to a lower court's pre-*Rose v. Lundy* denial of a mixed habeas petition shows that it is not up to the courts of appeals to re-balance federal-state comity against conservation of judicial resources. That balance was struck in *Rose v. Lundy.* As the Third Circuit recently said in holding that *Rose v. Lundy* must be applied retroactively, "we are not free to consider whether the burdens imposed by the *Rose v. Lundy* rule will be commensurate with the benefits articulated in its support by the Supreme Court." *Slotnick v. O'Lone,* 683 F.2d at 61. We now conclude, en banc, that *Rose v. Lundy* must be applied retroactively.

■ In his federal appellate brief, Graham requests that should we find any of his claims to be unexhausted, we should summarily dismiss the unexhausted claims as a means of complying with the total exhaustion rule. Appellee's Brief at 29–30. Graham has filed an affidavit in this court and in the district court below waiving any claims raised in his petition which this court finds to be unexhausted for purposes of *Rose v. Lundy.* This procedure is functionally equivalent to Justice O'Connor's suggestion in *Rose v. Lundy* that a habeas petitioner "can always amend the petition to delete the unexhausted claims, rather than returning to state court to exhaust all of his claims." 455 U.S. at 520, 102 S.Ct. at 1204. It has been adopted by this and other circuits. *Stewart v. Parratt,* 682 F.2d at 758. *See Rock v. Coombe,* 694 F.2d 908 (2d Cir.1982), *cert. denied,* — U.S. —, 103 S.Ct. 1773, 76 L.Ed.2d 345 (1983); *Guthrie v. Warden,* 683 F.2d 820, 821 n. 1 (4th Cir.1982). *Contra Bowen v. Tennessee,* 698 F.2d at 245–46. We will adopt this procedure also and accept Graham's waiver of

issues 5, 6, 9, 10, 11, 14 and 15. Thus, Graham's petition, as amended, only contains exhausted claims.

LAY, Chief Judge, dissenting, with whom HEANEY, Circuit Judge, joins.

The Supreme Court has not spoken on this issue. On weighing the retroactivity of any new doctrine one of the basic concerns relates to measuring the overall effect the application of a new rule will have if applied to pending cases. *Chevron Oil Co. v. Huson,* 404 U.S. 97, 106–07, 92 S.Ct. 349, 355–56, 30 L.Ed.2d 296 (1971); *Rudolph v. Wagner Electric Corp.,* 586 F.2d 90, 92–95 (8th Cir.1978), *cert. denied,* 441 U.S. 924, 99 S.Ct. 2033, 60 L.Ed.2d 397 (1979). Here the retroactive application of the mixed-exhaustion rule of *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982), creates a tremendous waste of judicial time already expended by federal district judges. *Richards v. Solem,* 693 F.2d 760, 763–64 (8th Cir.1982), *cert. denied,* — U.S. —, 103 S.Ct. 1898, 77 L.Ed.2d 286 (1983); *Dunn v. Wyrick,* 679 F.2d 731, 733 (8th Cir.1982).

I repeat what I have earlier observed: It is absurd to think that additional procedural roadblocks will deter prisoners from filing petitions to seek their release. Both federal courts and state courts who attempt to provide deterrents to prisoners by procedural technicalities only make work for themselves. It is true that procedural rules serve important policies as well. However, courts which too willingly enter into discussion of complicated and technical problems of exhaustion, which tackle procedural bypass questions with detailed determinations of "cause" and "prejudice," could conclude the proceedings more expeditiously by going directly to the merits. Post-conviction cases rarely result in relief; state and federal trial courts, now long familiar with established constitutional process, generally toe the constitutional mark. The merits of a case are more easily decided than the litigation of technical problems presented by procedural rules. The point is that all courts should be more resourceful by passing on the merits

of all claims as soon as possible, rather than resorting to intricately involved procedural concerns which only serve to extend simple issues into protracted and frustrating satellite litigation. The real losers are the courts themselves.

*Ashby v. Wyrick,* 693 F.2d 789, 796 (8th Cir.1982) (Lay, C.J., concurring).

Nonetheless, although this case was placed en banc in order for the court to decide this allegedly important question, I submit it never should have been argued. The issue was never really before us. In petitioner's brief he waived his nonexhausted claims so there was no longer any viable *Rose v. Lundy* question. I always thought it fundamental we should not discuss issues which do not present live controversies. Judge McMillian's statement about exhaustion in this case is strictly *obiter dictum.*

BRIGHT, Circuit Judge, dissenting.

I dissent from giving retroactive effect to *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982).[1]

The majority's holding on exhaustion overrules *Richards v. Solem,* 693 F.2d 760 (8th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1898, 77 L.Ed.2d 286 (1983), and *Dunn v. Wyrick,* 679 F.2d 731 (8th Cir.1982). Although the Supreme Court in *Rose v. Lundy* left open the retroactivity question, the majority apparently feels its holding is compelled by the three post-*Rose v. Lundy* summary orders issued by the Supreme Court. The Supreme Court has stated, "the lower courts are bound by summary decisions by this court 'until such time as the court informs [them] that [they] are not.'" *Hicks v. Miranda,* 422 U.S. 332, 344–45, 95 S.Ct. 2281, 2289, 45 L.Ed.2d 223 (1975), *citing Doe v. Hodgson,* 478 F.2d 537, 539 (2d Cir.) (brackets in quoted material), *cert. denied,* 414 U.S. 1096, 94 S.Ct. 732, 38 L.Ed.2d 555 (1973).

The majority's discussion of *Bergman v. Burton,* 456 U.S. 953, 102 S.Ct. 2026, 72 L.Ed.2d 478 (1982) (mem.), *Duckworth v. Cowell,* 455 U.S. 996, 102 S.Ct. 1626, 71 L.Ed.2d 858 (1982) (mem.), and *Rodriquez v. Harris,* 455 U.S. 997, 102 S.Ct. 1627, 71

L.Ed.2d 858 (1982) (mem.), fails to persuade me that the analysis undertaken in *Richards v. Solem* is incorrect. *See Richards,* 693 F.2d at 764. In the first two summary orders, *Duckworth* and *Rodriquez,* the Supreme Court vacated the lower court judgment and remanded with directions to dismiss the mixed habeas petition. Yet in the latest case, *Bergman,* the Court merely remanded the case to the Sixth Circuit for further consideration in light of *Rose v. Lundy.* This inconsistency demonstrates that the Supreme Court's three post-*Rose v. Lundy* orders do not mandate retroactive application of *Rose v. Lundy.*

Accordingly, I dissent from the majority's opinion overruling *Richards v. Solem* and *Dunn v. Wyrick.*

## II. THE MERITS

FAGG, Circuit Judge, with whom ROSS, ARNOLD, JOHN R. GIBSON and BOWMAN, Circuit Judges, join.

Because we hold that the district court failed properly to apply the "fairly supported by the record" standard of 28 U.S.C. § 2254(d)(8) in determining that the victim's identification testimony was inadmissible, we reverse the judgment of the district court granting the writ of habeas corpus.

The evidence presented at trial shows that the victim and her roommate met with a co-worker on August 22, 1977, to celebrate the co-worker's return to college. After smoking some marijuana and drinking some beer the three women traveled to a nearby Nebraska restaurant for dinner. Following their meal, the women returned to Yankton and went to a bar. While the victim was talking to an acquaintance, her friends left for a bar next door. Around midnight the victim left the bar to rejoin her friends next door. En route, she stopped to look inside a customized van which was parked on the street. While she was peering inside the open side door of the van, a man shoved her inside the van and forcibly restrained her. Two other men immediately got into the van and drove it

**1.** Specifically, I dissent from all but the final paragraph of section I. B.

away with the victim still inside. The victim later identified the driver as defendant Reiman and the passenger as petitioner Graham. The man who held her in the van was never identified. The van was driven into a building which the victim later identified as the Outasite Paint Shop owned by defendant Reiman. The men assaulted her, forcibly removed her clothing, and then repeatedly raped her for at least four hours. There were at least five men who attacked her, four of whom she later identified as defendants Reiman, Onstott, Elliott and Graham. Her attackers later released her near her home.

Immediately after being released by her captors, the victim went home and unsuccessfully tried to wake her roommate. She then went to the home of two friends and told them about the rape. Afterwards she returned home and spoke to her roommate about the rape. During her discussions about the rape, her roommate and friends mentioned that Reiman and his cohorts might be the rapists. Graham's name was not mentioned. The victim's roommate also mentioned that the rape could have occurred at Reiman's paint shop. That same day the victim went to the Yankton County Sheriff's office and gave the police descriptions of four of the assailants. She also drew a diagram of the building where the rape occurred.

On August 31, 1977, nine days after the assault, the police drove the victim around Yankton to see if she could identify any of her assailants. While touring the town, the victim pointed out defendants Reiman, Onstott and Elliott immediately upon seeing them for the first time after the rape. The next day the police drove the victim past a construction site where Graham was working and the victim noted Graham's similarity to her attacker. Later that day, as the police were driving the victim around town they went past an auto garage shop where Graham was located. The victim picked Graham out of a group of men standing in front of the garage and at that time she was "ninety percent sure" that Graham was one of her assailants. The police then brought Graham to the Yankton Public Safety Center for a one-man lineup or showup. At this point, the victim said she was absolutely certain that Graham was one of the rapists. Graham was arrested and charged with kidnapping and rape. Also that day, the victim accompanied the police in their execution of a search warrant at the Outasite Paint Shop. While at the paint shop, the victim recognized a bathroom mirror as one she had seen on the night of the rape. All the defendants admit to being at or near the Outasite Paint Shop during the hours the rape occurred.

The federal district court held that the victim's in-court identification of Graham was so tainted by the suggestive pretrial identification procedures that it denied Graham due process of law. For the reasons discussed below, we disagree.

## A. Overview

■ In reviewing a petitioner's state court conviction, a federal court must accord the state court findings of fact a "high measure of deference." *Sumner v. Mata,* 455 U.S. 591, 598, 102 S.Ct. 1303, 1307, 71 L.Ed.2d 480 (1982) (per curiam). Under 28 U.S.C. § 2254(d), the state court findings are presumed to be correct. Before such findings may be set aside, a federal court must do more than simply disagree with the state court: "it must conclude that the state court's findings lacked even 'fair[ ] support' in the record." *Marshall v. Lonberger,* 459 U.S. 422, 103 S.Ct. 843, 850, 74 L.Ed.2d 646 (1983); 28 U.S.C. § 2254(d)(8). Conversely, when the state findings have the necessary support, the statute requires "the federal courts to face up to any disagreement as to the facts and to defer to the state court." *Sumner v. Mata, supra,* 455 U.S. at 597, 102 S.Ct. at 1307.

■ In the process of finding the underlying facts, credibility determinations are left for the state courts to decide; we are not permitted to substitute our judgment as to the credibility of witnesses for that of the state court. *Maggio v. Fulford,* — U.S. ——, 103 S.Ct. 2261, 2262, 76 L.Ed.2d 794 (1983); *Marshall v. Lonberger, supra,* 103 S.Ct. at 851. A federal court must accept credibility determinations

made by a state court just as any appellate court must accept the credibility determinations of a trial court. *King v. Strickland,* 714 F.2d 1481, 1494 (11th Cir.1983). Federal courts are not entitled to draw inferences which are adverse to, or conflicting with, the state courts' factual determinations. *Marshall v. Lonberger, supra,* 103 S.Ct. at 851. It is immaterial that the state court made its factual findings on a cold record instead of live testimony. This does not alter the fundamental principles of federal-state relations on which the limitations of section 2254(d) are founded. *See Sumner v. Mata,* 449 U.S. 539, 550, 101 S.Ct. 764, 770, 66 L.Ed.2d 722 (1981). A state appellate court may be a fact finder for purposes of 28 U.S.C. § 2254(d). *Id.* at 545–48, 101 S.Ct. at 768–69; *Green v. Zant,* 715 F.2d 551, 558 (11th Cir.1983).

■ We disagree with the approach of both the district court and the dissent in at least two respects. The first disagreement concerns the deference that a federal court must accord to a state court's factual findings. In this case, there are conflicting arrays of evidence, one which favors the victim's identification and another which suggests that the victim was mistaken in identifying Graham. The South Dakota Supreme Court based its findings upon the evidence that supports its determination that the victim's identification was reliable from a constitutional standpoint. We believe that under the proper balance of federal and state roles in habeas corpus cases, the state courts are afforded the right to make such a choice from competing bodies of evidence. The federal role is simply to ascertain whether the state court's choice has fair support in the record.

■ Second, we accept as a natural attribute of the adversary system that internal contradictions within the testimony of individual witnesses, as well as contradictions between witnesses, are inevitable, and are matters properly to be resolved by the fact finder based upon its sense of credibility. The victim of a rape has gone through a traumatic experience that is ripe for confusion, contradiction, and self-doubt. It is inherent in the fact finding process for the state court to determine the extent to which these considerations diminish the weight of the victim's testimony. The district court and the dissent are skeptical of the presence of any evidentiary contradictions, and they have relied upon evidentiary contradictions in the record to discredit the victim's testimony, which the state court found credible, and to find a set of facts considerably different from those found by the state court. We believe this methodology is at odds with the limited federal role under section 2254(d).

## B. Reliability of the Identification

■ Graham's due process challenge to the victim's in-court identification is examined under a two-step test:

> The first step is to determine whether the challenged confrontation between the witness and the suspect was "impermissibly suggestive." *Simmons [v. U.S.],* 390 U.S. [377] at 384, 88 S.Ct. [967] at 971 [19 L.Ed.2d 1247]. If so, the second inquiry is whether, under the totality of the circumstances of the case, the suggestive confrontation created "a very substantial likelihood of irreparable misidentification." *Manson [v. Brathwaite],* 432 U.S. [98], at 116, 97 S.Ct. [2243] at 2254 [53 L.Ed.2d 140].

*United States v. Henderson,* 719 F.2d 934, 936 (8th Cir.1983). *See also United States v. Amrine,* 724 F.2d 84, 87 (8th Cir.1983). Pared to its essence, the second inquiry is whether the identification is reliable. *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977); *United States v. Amrine, supra,* 724 F.2d at 87. In *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), the Supreme Court provided criteria for an orderly marshaling of the facts incidental to an application of the legal standard of reliability. The following factors are to be considered:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confronta-

tion, and the length of time between the crime and the confrontation. *Id.* at 199–200, 93 S.Ct. at 382. Against these factors, the court must weigh the corrupting effect of the suggestive identification itself. *Manson v. Brathwaite, supra,* 432 U.S. at 114, 97 S.Ct. at 2253; *United States v. Henderson, supra,* 719 F.2d at 937.

■ The ultimate question of the constitutionality of admitting the in-court identification is not governed by section 2254. The questions of fact that underlie this conclusion, however, are governed by the statutory presumption. *Maggio v. Fulford, supra,* 103 S.Ct. at 2264–65; *Sumner v. Mata, supra,* 455 U.S. at 597, 102 S.Ct. at 1307 (1982). "Thus, whether the witnesses in this case had an opportunity to observe the crime or were too distracted; whether the witnesses gave a detailed, accurate description; and whether the witnesses were under pressure * * * are all questions of fact as to which the statutory presumption applies." *Sumner v. Mata, supra,* 455 U.S. at 597, 102 S.Ct. at 1307.

■ Considering the first part of the two-step test, there is little doubt in this case that at least the final out-of-court confrontation, the showup, was impermissibly suggestive. We have previously noted that a showup is "the most suggestive, and therefore the most objectionable method of pre-trial identification." *United States v. Henderson, supra,* 719 F.2d at 937, quoting *United States v. Cook,* 464 F.2d 251 (8th Cir.), *cert. denied,* 409 U.S. 1011, 93 S.Ct. 457, 34 L.Ed.2d 305 (1972). Once the victim had selected Graham from a distance as a person resembling her attacker, there was no necessity for this suggestive procedure of showing Graham to the victim singly. *See Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967).

The focus in this case is on the second step of the test: whether the in-court identification was reliable, even though an identification procedure was suggestive. The South Dakota Supreme Court made factual findings with regard to each of the *Biggers* factors and these findings must each be examined properly within the context of section 2254(d) to determine whether they

have fair support in the record. Once each of these factors has been considered, giving proper deference to the state court findings, then the federal court must determine the legal question of whether the pretrial identification procedure has caused a very substantial likelihood of irreparable misidentification.

### 1. The Opportunity of the Victim to View the Criminal at the Time of the Crime

The South Dakota Supreme Court found that "[t]he victim in this case had an unusual opportunity to view the defendant over a period of several hours." *State v. Reiman,* 284 N.W.2d 860, 871 (S.D.1979). Further, the South Dakota Supreme Court noted the victim's motivation carefully to observe the appearance of her attackers. *Id.* at 872. Thus, putting opportunity and motivation together, the court found that a mental image of the attackers was indelibly fixed in the victim's mind during the extended assault. *Id.*

The record amply supports the supreme court's finding. At trial the victim testified as follows:

Q. Were you able ever while they were having intercourse with you, either orally or otherwise, to see their faces?

A. Yes.

Q. Did you have an opportunity to see them more than once?

A. Yes.

Q. And for more than a brief time?

A. Yes.

Q. For quite a long period of time?

A. Yes.

Q. Is there any doubt in your mind that these are four of the men?

A. There is no doubt. These are the four.

Tr. 829–30. At another point during the trial she stated, "I'm positive it's these four. *I can never forget their faces.*" Tr. at 860 (emphasis added).

Confronted with the state court findings and the clear evidence that supports them, the federal courts are in no position to make different findings or to draw adverse inferences to the effect that the victim's ability to perceive or recall was impaired. The victim was the only person to testify about her opportunity to see her attackers, and she stated that she had the ability to observe the men's faces and that she did so. The victim stated specifically that she saw Graham both in the van and when he forced her to have intercourse. Tr. at 811, 827.

The district court and the dissent choose to focus on the evidence that the victim's perception was blurred due to the consumption of alcohol and marijuana. The South Dakota Supreme Court specifically noted the victim's smoking and drinking. *State v. Reiman, supra,* 284 N.W.2d at 863. Nevertheless, the state court found that the victim had an excellent opportunity to view Graham, that she did so, and that the observations were stamped into her memory. This finding subsumes the question of the victim's blurred perception. The state court necessarily took into account the victim's smoking and drinking, and the state court did not deem these factors to be impairments to the victim's perception. There is evidence to support the state court's findings concerning the victim's perception. The victim testified at her deposition that she "was not drunk" and that she was acting normally. Dep. at 449. One of the victim's companions did not think she was intoxicated. Tr. at 704. The other companion did not think she was acting unusual or high. Tr. at 770. Moreover, there was no testimony that the victim's senses were dulled during the course of the rape, which lasted at least four hours—long after the time frame when any witness testified as to having seen her. The victim's testimony shows that the sordid details of the prolonged attack were committed to her memory.

The dissent also emphasizes that the victim did not have her glasses and that this impaired her perception. The victim is nearsighted, not farsighted, and only needs her glasses for driving. "Q. That means you can see things real close but not very far away. A. Yes." Tr. at 897. Hence, it is unlikely that she would have needed her glasses to view her attackers, whom she viewed at necessarily close range. In any event, the specific finding of the state court that she was able to view her attackers subsumes the question of her impaired vision, and the federal court is not permitted to draw such an adverse inference.

The district court and the dissent emphasized the fact that the rape occurred in darkness. Once again, the state court necessarily took the lighting conditions into account in finding that the victim was able adequately to view her attackers. The only testimony that the room was dark was by the victim, who nevertheless stated that she could view her attackers and that a light was shining in the bathroom. Tr. at 821, 829. Finally, it should be noted that the Supreme Court has found victims of violent crime able to view their attackers sufficiently in lighting conditions that have been far from ideal. *See Neil v. Biggers, supra,* 409 U.S. at 193–94, 93 S.Ct. at 379–80 (victim viewed assailant in dark kitchen lighted only by adjoining bedroom and also outdoors in woods, by moonlight; entire incident lasted 15–30 minutes); *Coleman v. Alabama,* 399 U.S. 1, 4, 90 S.Ct. 1999, 2000, 26 L.Ed.2d 387 (1970) (brief view on dark highway lighted only by passing car's headlights).

2. The Victim's Degree of Attention.

The South Dakota Supreme Court concluded that "[i]n view of the circumstances, we can assume the witness' degree of attention was very high." *State v. Reiman, supra,* 284 N.W.2d at 872. The district court and the dissent agree with this finding.

3. Accuracy of the Victim's Prior Descriptions of the Criminal

The South Dakota Supreme Court found that there was no inaccurate prior description "because only four descriptions were given when there were at least five assailants. Graham could thus have been completely omitted from the group of suspects described." *Id.* There is ample record sup-

port for this finding. From the outset, she claimed rape by "six guys." Tr. at 736. On August 23 she gave the sheriff four descriptions, not including Graham. Dep. at 454–55. The victim testified at trial that she did not identify Graham's characteristics and features to the sheriff on August 23 because "[a]t *that time*" she "couldn't remember." Tr. at 892 (emphasis added). The victim provided a plausible explanation for her omission: she stated that when she saw the sheriff on that day, she was still "in shock." Dep. at 454; Tr. at 892. The victim explained her reaction: "Maybe you can't understand, but I was blocking everything and that was all I could remember at that time." Dep. at 454. She stated that "within the next few days" she began to remember Graham's identity: "I just started remembering. And I could remember the other ones clearer and that is when he came to mind." Dep. at 456.

Of course, there are inconsistencies in the victim's testimony but the fact finding role of selectivity and credibility is for the state court. Based upon the record, the South Dakota Supreme Court was in a position fairly to find that the victim did not misdescribe Graham before she saw him at the construction site. Hence, the accuracy of her description cannot fairly be eroded on the basis of the descriptions given to the sheriff on August 23.

4. The Level of Certainty Demonstrated by the Victim at the Pretrial Confrontations.

In principle, one-on-one confrontations are suggestive. Nevertheless, the record demonstrates that the pretrial confrontations had as a common theme the victim's recognition of Graham tempered by restraint to avoid a hasty, mistaken identification. There is ample record support for the South Dakota Supreme Court's determination that the confrontations did not destroy the reliability of the victim's identification.

The difference in nature between two of the three pretrial confrontations and the victim's encounter with her attackers at the time of the gang rape is important. Of necessity, the victim's focus was upon the heads, faces, shoulders and arms of her attackers. Hence, any reluctance by the victim in identifying a male viewed from a distance in a head to toe profile does little realistically to dispel the reliability of an identification that was based upon a face to face encounter.

#### a. The first confrontation

The victim first viewed Graham at a construction site from a distance of forty yards. She noted Graham's resemblance to her attacker but she stated that "I couldn't tell for sure because the man had on a coverall suit and he had on a hard hat. I said if he could take that hat off, I could tell better because the man I remembered was balding towards the front of the head * * *." Tr. at 854. The South Dakota Supreme Court found from the circumstances that the victim's reluctance to make a positive identification was prompted by caution, not doubt, and indicated a high degree of reliability. *State v. Reiman, supra,* 284 N.W.2d at 872. The officers did not point Graham out or tell the victim who he was. She was driving "all over" with the officers and only told to "keep your eyes open." Tr. at 853. It was the victim that saw the two men at work and noticed the similarity between Graham and her attacker. Tr. at 854.

#### b. The second confrontation

The victim next viewed Graham as he was standing in front of a garage with a group of other men. It was dark, making an identification based upon a close quarters encounter with the assailants somewhat difficult. The victim was riding in a car driven by an officer without any indication from him where they were going or who they might see. Tr. at 854; Dep. at 415. The officer stated, "we are going to just drive around again, and just keep your eyes open." Tr. at 854. The victim testified that they drove around the streets while she viewed people. Tr. at 854. They drove by an auto garage shop and there were a group of men standing in the door. The victim picked Graham out of the group.

They drove by the garage a number of times, according to the victim, because it was not until the third time that "he [Graham] was standing in the light and I could see him." Tr. at 855. The victim said she was "ninety percent sure" at that time that Graham was the man. Tr. at 855. The state trial court felt the victim had made a positive identification at this time. The victim did indicate a desire, however, to get a closer look at the man. Tr. at 855.

The facts underlying the first and second encounters dispel any notion of a very substantial likelihood of misidentification. The police merely drove the victim around the streets of Yankton without any coaching or suggestive remarks. The victim made the identification responses on her own, without any prompting by the officers. It was the victim herself, not the police, who requested a closer viewing of Graham, an opportunity she received in the third encounter.

### c. *The third confrontation*

The victim's third viewing of Graham occurred at the public safety center. Graham was in the center for questioning and the victim observed him through a glass door. This was the first time the victim had viewed Graham at close range. At this viewing, the victim stated she was sure of Graham's identity as one of the rapists:

Q. Could you recognize him at that time?

A. Yes, that's when—because I was sure before, but there was still some doubt in my mind. And I knew if I could just see him closer than I had been seeing him, I would know. And the thing that really made me sure was when I saw the tattoo on his left arm. I don't remember what it is, but I remembered it from that night.

Tr. at 855.

The South Dakota Supreme Court recognized the practical nature of the exposure the victim had to Graham when she was attacked, when it made the point that when she saw his bald head and tattooed arm, "this crystallized the identification in her mind." *State v. Reiman, supra,* 284 N.W.2d at 871. Notwithstanding the victim's testi-

mony, and the state court's finding, that this completed the identification in her mind, the district court stated, "I do not consider the mention of the tattoo to be a significant part of the identification of Mr. Graham." We cannot agree that the victim's recognition of distinctive physical characteristics was entitled to so little weight.

■ The victim's remarks confirm the state court finding that before she had the confrontations the rapes had already indelibly printed the faces of the attackers in her mind. The victim's reactions under the circumstances comport with our common-sense knowledge of how memory works. "The lack of a 'graphic description' or even the failure to describe the assailant is not decisive since 'most persons immediately after or a short time after viewing a person, particularly under circumstances that occasion an interest in his appearance, are able mentally to photographically recognize that person.'" *Jones v. Director, Patuxent Institution,* 351 F.Supp. 913, 940 (D.Md.1972), quoting *Gallagher v. United States,* 406 F.2d 102, 105 (8th Cir.), *cert. denied,* 395 U.S. 968, 89 S.Ct. 2117, 23 L.Ed.2d 756 (1969). The South Dakota Supreme Court, after reviewing the evidence, found that the victim was being cautious about her identification. That finding has support in the record and must therefore be accepted by this court. Some initial hesitancy on the part of a victim does not necessarily render the identification unreliable. *See Smith v. Perini,* 723 F.2d 478, 482 (6th Cir.1983); *Summitt v. Bordenkircher,* 608 F.2d 247, 252–53 (6th Cir.1979), *aff'd sub nom., Watkins v. Sowders,* 449 U.S. 341, 101 S.Ct. 654, 66 L.Ed.2d 549 (1981). Indeed, we should encourage thoughtful reserve by a victim to the end of sparing suspects a hasty, ill-considered, positive identification.

The advice the victim received from her friends concerning the possible identity of her attackers, while suggestive, was not crucial to Graham's identification. The victim did not know any of the attackers prior to the rape. Tr. at 961. She had not seen them before and was not aware of their

names. Tr. at 962. Because she was in a state of shock the victim did not describe Graham to her friends. Tr. at 892. The victim's friends mentioned that the attackers might be "Bud Reiman," "Onstott," and "Bud Reiman's crew." Dep. at 377; Tr. at 899. There is no evidence that Graham's name was mentioned by the victim's friends as a suspect; indeed, the victim testified that Graham's name was never mentioned. Tr. at 899. Moreover, when the victim spotted Graham on the construction site and later viewed him at the garage and the public safety center, she was not informed that Graham was associated with Reiman or Onstott.

### 5. The Length of Time Between the Crime and the Confrontations

The South Dakota Supreme Court found that the time which elapsed between the rape (August 22) and the victim's identification (August 31) was not unreasonably long. *State v. Reiman, supra,* 284 N.W.2d at 872. The district court and the dissent agree that this was "short enough for the victim to have any memories of the rape still fresh in her mind."

### 6. Other Indicia of Reliability

Under the *Biggers* test for the admissibility of an eye-witness identification, other evidence of guilt does not play a formal role in the analysis. *See Manson v. Brathwaite, supra,* 432 U.S. at 116, 97 S.Ct. at 2253. Yet, it is difficult to ignore additional facts which indicate that the actual likelihood of misidentification in this case was slim. Indeed, it seems unnatural to set such evidence aside when one considers that the ultimate purpose of the *Biggers* factors is to avoid eyewitness testimony where there is "a very substantial likelihood of irreparable misidentification." *Neil v. Biggers, supra,* 409 U.S. at 198, 93 S.Ct. at 381; *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). The following factors do not seem wholly irrelevant to whether, in fact, there was such a substantial likelihood of misidentification in this case: (1) the victim was raped by four or more men; (2) all four men convicted of the rape admit to being together at the

Outasite Paint Shop during the time the rape occurred; and (3) the rape victim identified the Outasite Paint Shop as the location of the rape. Although it played no part in its analysis, the Supreme Court noted in *Manson* that the reliability of the identification was "hardly undermined" by facts which connected the defendant with the scene of the crime. *Manson v. Brathwaite, supra,* 432 U.S. at 116, 92 S.Ct. at 2254.

The dissent concludes that the victim's identification of the Outasite Paint Shop as the scene of the crime is "of questionable reliability." The state court specifically found that this identification was reliable, and this finding is amply supported by the record. On direct examination, the victim was asked what she remembered about the appearance of the building where she was raped:

> Right away I knew it was some type of garage. You could smell the oil and the dirt. I got the impression at first that it was a dirty place. It was cluttered. I remember seeing cars all over in there, cars being worked on. I don't know how many, but they had different parts taken out and being put in, but it was so dark in there. I remember the cement floor with grease all over it.

Tr. at 820. The victim also testified that she remembered the mirror in the bathroom at the Outasite Paint Shop:

> I remember it well because when I went into the bathroom, I ran there, I don't know why, to get away; because I was bleeding from my nose, and I was just running. There was blood all over, and I remember looking above the bathroom sink in the mirror. The mirror was small, it was narrow, and there were red paint designs on it, weird ones, kind of. And I remember looking in and seeing my bloody face in that red painted mirror, and I just don't think I can ever forget it.

Tr. at 821. Finally, the victim testified in her deposition that she remembered the distinctive smell of the garage, the windows of the garage door, the feel of the steel posts which she had held onto, the location of the toilet, and the general appearances of the

sink and the light in the bathroom. Dep. at 424–26. It is difficult to conceive what better evidence could be required fairly to support the state court finding than the detailed and realistic testimony of the victim.

## C. **Weighing Reliability and Suggestiveness**

To determine the ultimate legal question in this case—whether the victim's in-court identification violated Graham's rights under the due process clause—we must balance the suggestiveness of the identification procedure against the reliability of the eyewitness identification. The reliability of the identification is "the linchpin in determining the admissibility of the identification testimony." *Manson v. Brathwaite, supra,* 432 U.S. at 114, 97 S.Ct. at 2253.

In assessing the relative reliability of an identification, it is crucial to remember that the court is not deciding the truth or falsity of the testimony, but only whether there is such a substantial likelihood of irreparable misidentification that the testimony should not be heard by the jury. The testimony need not be without fault: "evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." *Id.* at 116, 97 S.Ct. at 2254. Indeed, a cornerstone of our judicial system is the confidence we place in the ability of jurors to determine the truthfulness and accuracy of a witness' testimony. Nowhere is Justice Black's admonition against robbing the jury of this vital function more appropriate:

> [I]t is an incontestable fact in our judicial history that the jury is the sole tribunal to weigh and determine facts. That means that the jury must, if we keep faith with the Constitution, be allowed to hear eyewitnesses and decide for itself whether it can recognize the truth and whether they are telling the truth. It means that the jury must be allowed to decide for itself whether the darkness of the night, the weakness of a witness' eyesight, or any other factor impaired the witness' ability to make an accurate iden-

tification. To take that power away from the jury is to rob it of the responsibility to perform the precise functions the Founders most wanted it to perform. And certainly a Constitution written to preserve this indispensable, unerodible core of our system for trying criminal cases would not have included, hidden among its provisions, a slumbering sleeper granting the judges license to destroy trial by jury in whole or in part.

*Foster v. California,* 394 U.S. 440, 447, 89 S.Ct. 1127, 1131, 22 L.Ed.2d 402 (1969) (Black, J., dissenting).

We are unable to conclude that there was such a substantial risk of irreparable misidentification in this case that the state trial judge committed constitutional error by admitting the victim's testimony identifying Graham. Without doubt, the identification procedure employed by the state was suggestive. Nevertheless, there were sufficient indicia of reliability to warrant the admission of the identification testimony. Giving proper deference to the state courts, we are faced with these facts concerning the reliability of the identification: the victim had an adequate opportunity to view her attackers at painfully close range for at least four hours; as a victim of this most degrading crime her degree of attention was very high; the victim's level of certainty in identifying Graham was high; and finally, she identified Graham reasonably soon after the crime. The only *Biggers* factor which arguably detracts from the reliability of the identification is the absence of a prior description of Graham and this is satisfactorily explained by the victim's initial emotional reaction to the brutal encounter with the rapists.

In assessing the importance of the victim's failure to give a prior description of Graham, consideration must be given for the victim's real life situation when she is forcibly raped by a gang of strangers. As explained earlier, it has not been shown that the victim misidentified Graham and she provided a plausible explanation for her omission—shock. The approach to the test of reliability must have a measure of flexi-

bility; otherwise, the victim is in an impossible situation. If common sense and practical experience are drawn upon, the victim's identification does not seem improbable or unreliable for the purposes of our constitutional analysis. Indeed, it is a common experience that after encountering strangers, an individual may not be able meaningfully to describe them to others. Yet, the faces may be etched in his or her memory, and upon seeing them again there is an immediate recognition. This appears precisely to have been the situation in this case. As the victim stated, she could "never forget their faces." Tr. at 860.

 Considering the totality of the circumstances in this case, the mere failure to give a prior description does not render the identification testimony constitutionally infirm. Cf. United States ex rel. Hudson v. Brierton, 699 F.2d 917, 925 (7th Cir.), cert. denied, —— U.S. ——, 104 S.Ct. 114, 78 L.Ed.2d 115 (1983); Brayboy v. Scully, 695 F.2d 62, 65–66 (2d Cir.1982), cert. denied, —— U.S. ——, 103 S.Ct. 1505, 75 L.Ed.2d 935 (1983). Likewise, the intensity and duration of the victim's encounter with the rapists clearly overrides the suggestiveness of her post-rape confrontations with Graham. Any remaining concerns about the suggestiveness of the identification procedure or the reliability of the identification was properly to be considered by the jury in assessing the weight to be given the victim's testimony. See United States v. Singleton, 702 F.2d 1159, 1166 (D.C.Cir.1983); Summitt v. Bordenkircher, supra, 608 F.2d at 253. We conclude that the identification by the victim was reliable, there was not "a very substantial likelihood of irreparable misidentification," and therefore, Graham's constitutional rights were not violated by the state court's admission of the victim's identification testimony.

Accordingly, the judgment of the district court granting the petition for writ of habeas corpus is reversed.

LAY, Chief Judge, dissenting, with whom HEANEY, Circuit Judge, joins.

I join in Judge McMillian's analysis of the merits. I also point out that Justice Dunn, an able and experienced jurist, vigorously dissented in the South Dakota Supreme Court in State v. Reiman, 284 N.W.2d 860, 874 (S.D.1979). His analysis is keenly perceptive. He concluded his dissent by saying: "After this police procedure, it seems incredulous that the complaining witness' in-court identification had an origin independent of and untainted by these pretrial procedures." Id. I couldn't agree more.

BRIGHT, Circuit Judge, dissenting.

I believe the decision on the merits to be very close. However, as a judge on a reviewing court, I am unable to say that the district court misapplied the law to the generally uncontroverted facts. Accordingly, I join in Judge McMillian's view that we should affirm the district court.

McMILLIAN, Circuit Judge, dissenting, with whom LAY, Chief Judge, and HEANEY and BRIGHT, Circuit Judges, join.

I do not agree with the majority opinion's decision on the merits and therefore dissent. I believe the district court properly weighed the "corrupting effect" of the impermissibly suggestive identification procedures against the indicia of the witness' ability to make a reliable identification.

Graham's first and strongest argument is that the victim's in-court identification of him as one of the rapists violated his constitutional right to due process. The South Dakota Supreme Court held that even though the victim's in-court identification was unnecessarily suggestive, it was admissible because it had been purged of any taint arising from the illegal out-of-court identification procedures. State v. Reiman, 284 N.W.2d 860, 871 (S.D.1979). The South Dakota Supreme Court also ruled that even if the taint had not been purged, the in-court identification still would be admissible because its origin was independent of the improper out-of-court identification. The state supreme court found that the in-court identification "was based upon a mental image indelibly fixed in [the victim's] mind during the extended assault. As she stated at trial, 'I'm positive it's these four. I can never forget their faces.'" Id. at 872. The state argues that this court should adopt

this three-tiered approach and hold the in-court identification to be admissible, even if constitutionally lacking, because it was of independent origin. In my view this argument misperceives the current standard of due process review for eyewitness identifications.

In *Manson v. Brathwaite*, 432 U.S. 98, 113–14, 97 S.Ct. 2243, 2252–53, 53 L.Ed.2d 140 (1977) (*Manson*), the Supreme Court set forth the dual elements of a successful due process challenge to an in-court eyewitness identification. First, a defendant must prove that the in-court identification was the result of unnecessarily suggestive out-of-court identification procedures which by their nature engender a "very substantial likelihood of irreparable misidentification." *Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 381, 35 L.Ed.2d 401 (1972) (*Biggers*). Second, the defendant must prove that the identification was unreliable. *Manson*, 432 U.S. at 114, 97 S.Ct. at 2253. *Biggers* listed several criteria for determining reliability, including: the witness' opportunity to view the criminal during the crime, the witness' degree of attention, the accuracy of the witness' prior descriptions, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. 409 U.S. at 199–200, 93 S.Ct. at 382–383. In the final analysis, the court must balance the corrupting effect of the suggestive procedures against the reliability of the identification to determine if the use of the in-court identification violated the defendant's due process rights. *Manson*, 432 U.S. at 114, 97 S.Ct. at 2253; *Biggers*, 409 U.S. at 199–200, 93 S.Ct. at 382–383.

Thus, concepts of "purged taint" and "independent origin" have been blended into, and superseded by, the two-step process of weighing reliability against suggestiveness articulated in *Biggers*, 409 U.S. at 199–200, 93 S.Ct. at 382–383. *See Solomon v. Smith*, 645 F.2d 1179, 1185, 1188 & n. 9 (2d Cir. 1981). Today, "reliability is the linchpin in determining the admissibility of identification testimony." *Manson*, 432 U.S. at 114, 97 S.Ct. at 2253. Nonetheless, the South Dakota Supreme Court did rely on the *Biggers* criteria of reliability in determining that the in-court identification was purged of taint and was of independent origin. Therefore, I will assume that the state supreme court concluded that the identification was reliable and will review the court's findings accordingly.

## I. SUGGESTIVENESS

The South Dakota Supreme Court did not dispute that the one-man lineup identification of Graham was unnecessarily suggestive. *State v. Reiman*, 284 N.W.2d at 871.[1] The federal district court also held that the entire procedure used by the police to assist the victim's identification of Graham was

---

1. The South Dakota trial court, however, did state in denying Graham's pre-trial suppression motion that the identification procedures were not "unduly suggestive." *State v. Reiman*, No. 77–30, letter opinion at 2 (S.D. 6th Cir.Ct. Dec. 9, 1977) (Jones, J.) (located in Designated Record at 296–98, *State v. Reiman*, 284 N.W.2d 860 (S.D.1979)). Yet Judge Jones also stated:

 Such identification procedures are condemned by both *United States v. Wade*, 1967 [388 U.S. 218], 87 S.Ct. 1926 [18 L.Ed.2d 1149], and *State v. Keeling* [89] SD [436] 1975, 233 N.W.2d 586. *Keeling* establishes our rule that the burden is on the State after such a showing to establish by clear and convincing evidence that the pretrial identification was not unnecessarily suggestive. In deciding this motion, I have carefully read the depositions of all witnesses with particular reference to the identification procedures following with respect to Mr. Graham prior to this one-man lineup. Considering the

 facts of the rape, that there were no substantial discrepancies between [the victim's] pre-lineup description of Mr. Graham and his actual description, that she had previously identified Mr. Graham in a positive manner while he was standing near Nelson's Cycle Shop, I conclude that the one-man lineup of Mr. Graham did not taint possible future identifications of him so as to require that this court prohibit [the victim] from identifying Mr. Graham at the trial, if she is able to do so.

 *Id.*

 Translating these findings into the terms of a *Neil v. Biggers* analysis, it appears Judge Jones reasoned that the reliability of the identification, judged by the *Biggers* criteria, outweighed the suggestiveness of the "condemned" identification procedures. Thus, according to this analysis, the identification procedures, although they are to be condemned as impermissibly suggestive, were not "unduly" suggestive.

impermissibly suggestive and posed a very substantial likelihood of irreparable misidentification. The police focused their investigation on Graham even before the victim had a chance to view or identify him. Tr. at 1413. The police followed Graham throughout the day and allowed the victim to view Graham five times before presenting him to the victim in a one-man lineup. It was only after viewing Graham for the fifth time in a single day, including once through binoculars, that the victim became "ninety percent sure" Graham was one of her rapists. In my opinion the district court correctly determined that:

> By the use of these procedures I am sure that the investigating officers planted the seeds of an identification in the mind of [the victim]. The seeds of the identification were nurtured by each successive showing of the petitioner to [the victim]. By the time of trial what had been mere seeds blossomed into a complete and unequivocal identification.

*Graham v. Solem,* No. CIV80–4174, mem. op. at 9 (D.S.D. Feb. 16, 1982).

## II. RELIABILITY

In applying the *Biggers* reliability criteria to the present case, the South Dakota Supreme Court concluded that: (a) the victim had an unusual opportunity to view the defendant over the course of several hours; (b) her degree of attention was high due to the nature of the crime; (c) although none of the victim's prior descriptions of her rapists matched Graham's appearance, Graham could have been the fifth rapist for whom no description was given; (d) the victim was very certain of her in-court identification; and (e) only ten days separated the confrontation from the crime. *State v. Reiman,* 284 N.W.2d at 871–72.

Under *Sumner v. Mata,* 449 U.S. 539, 551, 101 S.Ct. 764, 771, 66 L.Ed.2d 722 (1981),

federal courts must give a presumption of correctness to these factual determinations unless one of the eight exceptions contained in 28 U.S.C. § 2254(d) is present.[2] The failure of the record in the state court proceeding, considered as a whole, to fairly support the state court's factual determination is one such exception. *Id.* § 2254(d)(8). I agree with the federal district court that Graham has borne his burden of proving that the state trial and supreme courts' factual determinations in applying the *Biggers* criteria of reliability are not supported by the record. I come to this conclusion cognizant of the "high measure of deference" to be accorded state factual findings, as well as the virtually absolute deference to be paid the credibility determinations of a state court judge who has heard the witness' live testimony. *See Marshall v. Lonberger,* 459 U.S. 422, 103 S.Ct. 843, 850–51, 74 L.Ed.2d 646 (1983). In this case, however, there have been no credibility determinations, explicit or implied, by a state court judge who has heard the witness' live testimony because no live testimony was presented to the state courts. The state trial court decided Graham's motion to suppress the identification based solely on the cold record of the relevant witnesses' written depositions, including the deposition of the victim. *See* note 1 *supra.* I am convinced, and convinced mainly by the testimony of the victim herself, that several of the state trial and supreme courts' factual findings lack fair support in the record.

### A. Opportunity to View

The South Dakota Supreme Court failed to mention in its *Biggers* analysis that there was extensive testimony that the victim was under the influence of both alcohol and marijuana at the time of the rape. *See, e.g.,* Tr. at 800, 888, 1301–03, 1311–12, 1903–04.[3] It also failed to note that the victim

---

**2.** Findings relating to the *Biggers* criteria are factual determinations and are entitled to the presumption of correctness. The conclusion that there was or was not a substantial likelihood of misidentification, which is drawn from weighing the *Biggers* criteria against the suggestiveness of the identification procedures, is a question of law and is not entitled to the presumption of correctness. *See Neil v. Big-*

*gers,* 409 U.S. 188, 193 n. 3, 93 S.Ct. 375, 379 n. 3, 34 L.Ed.2d 401 (1972); *Dickerson v. Fogg,* 692 F.2d 238, 242–43 (2d Cir.1982).

**3.** The majority opinion points out that the friends who had accompanied the victim to the bar testified that the victim was not intoxicated. However, these friends had parted company with the victim shortly after arriving at the

was not wearing her prescription glasses at the time of the rape. The victim testified that she is nearsighted and especially needs her glasses to see at night. Tr. at 896–97. The rape occurred at night. The record shows that the victim's opportunity to view her assailants was limited by impaired perception.

## B. Attentiveness

I agree that, because of the nature of the crime, the victim's attention was high. Her ability to perceive and recollect, however, may have been impaired.

## C. Prior Descriptions

The victim testified that Graham was the passenger of the van in which she was accosted and that the passenger was one of the two assailants she remembered most. Tr. at 893. Yet the victim testified that none of the descriptions she gave the police matched Graham's appearance. Tr. at 891. The South Dakota Supreme Court stated that any discrepancies between the descriptions and Graham's appearance were not substantial because the victim gave only four descriptions and there were at least five assailants. Graham, the court concluded, could have been the fifth undescribed assailant. *State v. Reiman,* 284 N.W.2d at 872.

This factual conclusion is not supported by the record. First, it is difficult to believe that the victim would not have described one of the persons she remembered most, especially when his face was "indelibly fixed in her mind." *Id.* Second, the victim admitted on the stand that she had described the four assailants which she remembered most and that none of those descriptions matched Graham's appearance. Tr. at 893. Third, and most importantly, the victim testified that Graham was the passenger in the front of the van in which she was abducted. In her deposition the victim gave a description of that passenger to the police before being subjected to the impermissibly suggestive identification pro-

cedures. The description of the van's passenger given by the victim does not in any way match Graham's appearance. This shows that Graham could not have been the fifth (or possibly sixth) undescribed assailant. The victim herself testified that she did describe the passenger in the front of the van and that Graham was that passenger. The majority opinion's conclusion to the contrary is untenable in the face of the victim's own testimony. The only conclusion which can be drawn from the record is that the victim did give a description of the assailant she claims is Graham and that description does not match Graham's appearance. Tr. at 893–94. This criterion suggests that the victim's in-court identification was unreliable.

## D. Level of Certainty

At trial and at the one-man lineup, the victim said she was absolutely sure that Graham was one of her rapists. But the trial and the one-man lineup were not the victim's only confrontations with Graham. Earlier confrontations evoked less certainty which, through the course of impermissibly suggestive identification procedures, was gradually increased to 80–90% certainty at the fifth confrontation, just prior to the lineup. Tr. at 855. The focus of the certainty criterion must be on the eyewitness' level of certainty *before* being exposed to legally impermissible confrontations. As the Second Circuit has recently emphasized:

> Certainty entails confidence in one's identification of a suspected perpetrator. Hesitancy, the inability to be positively sure about a suspect, and the extent to which an affirmative identification is the product of prodding by others, are signals which undermine the certainty of the witness's identification of the suspect at the pre-trial confrontation.

*Dickerson v. Fogg,* 692 F.2d 238, 246 (2d Cir.1982). *See United States ex rel. Phipps v. Follette,* 428 F.2d 912, 915 (2d Cir.), *cert. denied,* 400 U.S. 908, 91 S.Ct. 151, 27

---

bar. Testimony from two witnesses who saw the victim shortly before the victim was abducted indicates that the victim was probably

under the influence of an intoxicant at the time of her abduction. Tr. at 702, 705, 707, 709, 712–15, 732, 735.

L.Ed.2d 146 (1970). Here, the victim displayed a great deal of uncertainty during the initial stages of the impermissibly suggestive procedures used by the police to help her identify Graham. This uncertainty stands in marked contrast to the instant certainty the victim exhibited in identifying the other three defendants. Tr. at 847–51. This contrast is highlighted further by the victim's testimony that she remembered the rapist she now claims is Graham better than the other three defendants whom she identified upon seeing for the first time. The record reveals a discernible progression in the victim's level of certainty—from her initial descriptions to the police when Graham's physical features had not yet appeared in her memory, Tr. at 892, to the trial where she testified that she would never forget Graham's face. This rising level of certitude reinforces the conclusion that the victim's certainty in identifying Graham at trial is more the product of the police's prodding than it is an indication of reliability.

The South Dakota Supreme Court gave special weight to the victim's testimony that she was able to positively identify Graham at the one-man lineup because she recognized the tattoo on his arm. *State v. Reiman*, 284 N.W.2d at 872. Yet she never described this tattoo to the police prior to the lineup and could not describe it at trial without prompting from the prosecuting attorney. Tr. at 855. Recognition of a tattoo is even less significant when one notes that both defendants Reiman and Elliott had tattoos and that the victim testified she saw "a lot of tattoos throughout the night." Tr. at 855–56.

The most telling indicia of unreliability of the victim's identification *of Graham* is the instant and absolute certainty that the victim displayed when she identified the other three co-defendants in a crowded room without prompting from the police. This factor sets Graham apart from his co-defendants. The victim gave no indication that she had a greater or lesser opportunity to view any particular assailant. Indeed, she testified that she remembered the particular assailant, whom she now says is Graham, the most. When she was taken to identify individuals as possible assailants, she instantly and without hesitation pointed out Graham's co-defendants. Yet when her attention was specifically directed toward Graham, Tr. at 1060, 1062, she was unable to positively identify Graham as one of her assailants. See Tr. at 1056–66. This uncertainty continued until the impermissibly suggestive identification procedures indelibly fixed Graham's features into the victim's memory. The majority opinion speaks of the practical, common sense workings of memory and notes that memory ripens over time. This is indeed true, but *Biggers* teaches us that if an eyewitness' memory is nurtured by successive showings of a defendant to the victim, the victim's identification must be accompanied by other indicia of reliability. *See generally* E. Loftus, Eyewitness Testimony (1979); Rahaim & Brodsky, *Empirical Evidence Versus Common Sense: Juror & Lawyer Knowledge of Eyewitness Accuracy,* 7 Law & Psych.Rev. 1 (1982); Note, *Eyewitness Identification Testimony & the Need for Cautionary Jury Instructions in Criminal Cases,* 60 Wash U.L.Q. 1387, 1387–02 (1983). One such indication is the level of certainty *before* the impermissibly suggestive identification procedures take hold. Here, the victim displayed a great deal of uncertainty about Graham, while displaying no uncertainty about identifying the other defendants. This difference in the level of the victim's uncertainty at the initial stages of what turned into an impermissibly suggestive identification procedure is a pivotal ingredient in my decision. I must also emphasize that no single factor convinced me that the victim's identification of Graham is unreliable. Rather, taken as a whole, the surrounding circumstances show that the few indications of reliability do not outweigh the highly suggestive nature of the identification procedures used in Graham's case, and Graham's case alone.

### E. Time Lapse

Only about ten days lapsed between the rape and the lineup. This was a relatively short time, short enough for the victim to

have any memories of the rape still fresh in her mind.

### F. Other Indicia of Reliability

The state urges us to consider as additional indicia of reliability the fact that all four defendants admitted they were at or near the Outasite Paint Shop during the hours the rape was committed. The victim had pinpointed the Outasite Paint Shop as the place where the rape occurred by identifying a mirror which came from the Outasite Paint Shop. The victim testified that during the course of the rape she broke free and ran into a bathroom where she saw a mirror with a red design on it. When the police showed her a mirror which came from the Outasite Paint Shop, she recognized it as the one she saw the night of the rape.

First, I note that Graham did not admit to being in the Outasite Paint Shop during the time the rape occurred. He did admit that he momentarily stopped by the Outasite Paint Shop but did not go in. He stated that he merely sat outside the area of the Outasite Paint Shop while talking on a CB radio and then left. Second, other evidence of guilt which does not relate to the witness' ability to perceive or remember should not enter into the process of determining an identification's reliability. *Green v. Loggins*, 614 F.2d 219, 225 (9th Cir.1980). *Compare Manson*, 432 U.S. at 116, 97 S.Ct. at 2253 (fact that defendant was found at the scene of the crime and admitted being there on several occasions played no part in the reliability analysis), *with Cronnon v. Alabama*, 587 F.2d 246, 250 (5th Cir.) (reliability supported by witness testimony that murderer left the store with a bag of peanuts because later-identified defendant was reported to have arrived home with a bag of nuts that he got "at the store"), *cert. denied*, 440 U.S. 974, 99 S.Ct. 1542, 59 L.Ed.2d 792 (1979). But even assuming

that Graham's admission to being outside of the Outasite Paint Shop the night of the rape can be used to show reliability, I find that the victim's identification of the Outasite Paint Shop as the scene of the crime was itself of questionable reliability.

Shortly after she was raped, the victim went to the home of two of her friends. While there she told her friends that she had been raped in a vacant room with just a sink and a mattress in it. Tr. at 1806. She did not mention the mirror[4] or that many cars cluttered up the room to her friends at that time. Tr. at 1806. When the victim told her roommate that she had been raped, her roommate suggested that Bud Reiman was probably the culprit. The roommate then described Reiman to the victim as having "long hair, a beard and tattoos." Tr. at 772. The victim responded that this description was accurate. The victim also described the room in which she was raped to her roommate. According to the roommate, the victim described the room as containing a van and several bikes. The roommate then suggested to the victim that the rape probably occurred in the Outasite Paint Shop, even though the roommate had never been inside the Outasite Paint Shop. Tr. at 787–88.

After her friends told her that Bud Reiman was probably one of the rapists and that he probably raped her in his garage—the Outasite Paint Shop—the police took the victim along with them when they executed a search warrant at Reiman's garage. It was only after these highly suggestive events that the victim's description of the place of her rape includes a reference to a room filled with cars in various states of repair—a description which matches Reiman's garage. *Compare* Tr. at 820 *with* Tr. at 1806.

This analysis does not suggest that the victim's identification of the Outasite Paint

4. I have tried to recite only the victim's testimony or other relatively uncontested testimony and did not originally explore the evidence in the record that tends to show that the mirror in the Outasite Paint Shop that the victim said she remembered from the night of the rape was actually purchased by Reiman *after* the night of

the rape. Tr. at 1871–84. There are other indicia of unreliability in the record beyond those elicited from the victim's own testimony. Most of the transcript citations in the dissenting opinion, however, are citations to the victim's testimony.

Shop is inadmissible. The degree of reliability of the paint shop identification *as the location of the rape* is for the jury to consider. The victim's identification of the paint shop as the location of the crime has only been reviewed in order to determine whether the victim, in general, could or could not perceive and *recollect* the events of that night accurately. The Outasite Paint Shop identification shows that the victim's ability to recollect accurately ripened only after the police subjected the victim to the impermissibly suggestive identification procedures.

Another factor which militates against a finding of reliability is the victim's descriptions of the van in which she was kidnapped. Initially, she described the van as being orange. Tr. at 864. Later, the victim testified that "[f]or a while I thought it was a green van." Tr. at 865. Finally, she described the van to the police as being white with gold trim and possibly bearing a large "happy face" insignia on its exterior. Tr. at 990. One of the defendants did own a van, but it was a two-tone gray color with a Maltese Cross painted on its exterior. Tr. at 1373–74.

One last indication of the victim's ability to accurately perceive and recollect events on the night she was raped is her recollection of the details of her kidnapping. Graham's counsel elicited the following testimony from the victim concerning Michael Peck, an acquaintance of the victim whom she saw at the bar just prior to her abduction, and the events which transpired while the victim was being forcibly restrained in the van outside the bar.

Q. Previously, you have testified, have you not, that Mike Peck came to the window of this van when you were inside held captive?

A. I said I wasn't for sure, but I thought he did. If someone did, it was Mike, but I can't swear that he did come to the window.

. . . .

Q. Perhaps you can explain it for me. You said if someone did, it was Mike.

A. I remember someone coming and talking to the passenger.

Q. Okay then, you remember it. Then it must have been Mike.

. . . .

A. Someone did come and talk to the passenger.

Q. Okay. We are back to that now. And you have previously just told me that if someone did, it was Mike. Are we sure now, someone did and it as Mike Peck.

A. I can't swear that it was Mike, but I know someone was there.

Q. Well, I don't want to argue with you, and I want to be fair, but you just told me if someone did, it was Mike. Now, are you retreating on that and saying it could have been someone other than him?

A. No, what I'm trying to say is I thought I saw Mike at the van door.

Q. Have you also testified previously that Mike looked in and saw you and then looked away?

A. Like he didn't know I was in there.

Q. But you did testify that you thought he saw you?

A. Yes.

. . . .

A. He was there, and then he was gone. That's why I can't say for sure if it was even him. Sometimes I think I just imagined it.

Q. You think you may have imagined it?

A. No, I think—I believe—I think—I believe he was there.

Tr. at 886–88. Mike Peck testified that he did not look in any van window on that night. Tr. 1304. It is interesting to note that Graham was also at the bar at the same time Mike Peck and the victim were there.

### III. WEIGHING RELIABILITY AGAINST SUGGESTIVENESS

As the United States Supreme Court said in *Manson,* a "witness must testify about an encounter with a total stranger under circumstances of emergency or emotional stresses. The witness' recollection of the stranger can be distorted easily by the circumstances or by later actions of the po-

lice." 432 U.S. at 112, 97 S.Ct. at 2252. I believe that is what occurred in this case.

The case of *Foster v. California,* 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969), is closely analogous to the present case. In *Foster,* the witness viewed the defendant on several occasions before the witness could make a positive identification. The witness first viewed the defendant in a lineup, but failed to identify the defendant. Then the police arranged the one-to-one confrontation between the defendant and the witness. When the witness could only make a tentative identification even after these confrontations, the police placed the defendant in another lineup a few days later. The defendant was the only person who was in both the first and second lineups. This third confrontation "produced a definitive identification." *Id.* at 443, 89 S.Ct. at 1129. The Supreme Court held that, as a matter of law, the identification procedures were so defective that the identification was constitutionally inadmissible. *Id.* n. 2. On far less egregious facts, the Second Circuit reached a similar conclusion. *See Dickerson v. Fogg,* 692 F.2d at 244–47.

In the present case, the few facts supporting the reliability of the victim's identification of Graham do not outweigh the suggestiveness of the identification procedures used. This leads to the conclusion that there was a very substantial likelihood of misidentification which violated Graham's due process rights. Because I would hold the admission of the victim's identification of Graham as one of her rapists was not harmless error, I would affirm the judgment of the district court granting the petition for writ of habeas corpus.